**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BALMORAL RACING CLUB, INC., and | ) | Case No. 14-45711 |
| MAYWOOD PARK TROTTING | ) | |
| ASSOCIATION, INC. | ) | (Joint Administration Requested) |
| | ) | |
| Debtors. | ) | |
| | ) | |

**DECLARATION OF RANDALL OLECH IN SUPPORT OF
CHAPTER 11 PETITIONS AND FIRST-DAY MOTIONS**

I, Randall Olech, under penalties as provided by law pursuant to 28 U.S.C. § 1746,

hereby certify that the following is true and correct to the best of my knowledge, information and

belief (the "Declaration"):

1.      I am the Chief Operating Officer and Chief Financial Officer of Balmoral Racing

Club, Inc. ("Balmoral") and Maywood Park Trotting Association, Inc. ("Maywood" and with

Balmoral, the "Companies" or the "Debtors").  I have served in such capacity for 6 years and

worked for both Companies for 18 years.

2.      Balmoral is a privately held corporation incorporated under the laws of the State

of Ohio, and licensed to do business in Illinois.  Their principal place of business and principal

offices are located at 26435 South Dixie Highway, Crete, Illinois.  Maywood is a privately held

corporation incorporated and existing under the laws of the State of Illinois.  Maywood's

principal place of business and principal offices are located at 8600 West North Avenue, Melrose

Park, Illinois.

3.      On December 24, 2014 (the "Petition Date"), Balmoral and Maywood each filed a

voluntary case under Chapter 11 of the Bankruptcy Code in the above-referenced court (the

"Chapter 11 Cases").  The Chapter 11 Cases are related and this Declaration is being filed in

each of the Chapter 11 Cases.

4.      World Wide Wagering, Inc., a Delaware corporation licensed to do business in

Illinois ("World Wide") owns 100% of the Companies' issued and outstanding shares. The filing

of the Chapter 11 Cases was authorized unanimously by the Board of Directors for each of the

Companies as well as the Board of Directors of the Companies' parent, World Wide. World

Wide's principal place of business and principal offices are located at Maywood's principal

offices.

5.      I and am very familiar with the Companies' prior and current day-to-day

operations, business affairs, and books and records.  I work closely with a core management

team that has an average of over 25 years of experience in the industry.  That team includes:

    a.      John A. Johnston, President of Maywood
    b.      William H. "Duke" Johnston, III, President of Balmoral
    c.      Paul J. Svendsen, V. P. - Finance - Maywood
    d.      Michael Belmonte, Controller and General Manager - Balmoral

6.      I am familiar with the Debtors' restructuring efforts, customer programs, cash

management systems and employee wages, healthcare and other benefits, all of which are the

subjects of the various "first-day motions" filed in these Chapter 11 Cases (collectively, the

"First-Day Motions," and individually, a "First-Day Motion") and motions to be filed in the first

several weeks of the Chapter 11 Cases.  As a result of my familiarity with these matters, as well

as my personal experience with the Companies and in the horse-racing business, I have formed

opinions regarding the necessity for the relief sought in the First-Day Motions, especially to the

extent that such relief will enable the Debtors to continue to operate in the ordinary course of

their business as they pursue a reorganization of their affairs.

7.      I have been authorized to, and hereby submit this Declaration in support of the First-Day Motions described below, as well as other motions and applications that the Debtors expect to file in the first several weeks of the Chapter 11 Cases.  Except as otherwise indicated, all statements set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents and records, and/or my opinion based upon my experience and knowledge of the Companies' operations and financial condition.  If I am called upon to testify, I can and will testify to the facts and matters set forth herein.  Any capitalized terms not expressly defined herein shall have the meaning ascribed to that term in the relevant motion.

8.      Based on my personal knowledge and the review discussed above, I believe that the relief sought by Maywood and Balmoral in the First-Day Motions is necessary to enable the bankruptcy estates to be administered effectively and to give the Debtors their best chance to effect a reorganization and maximize the value of the estates for the benefit of all creditors and parties in interest.  Failure to grant such relief would have a serious negative effect on the Debtors' efforts to continue operating during the Chapter 11 Cases.  For example, the Debtors must continue to use their existing cash management procedures and honor their "Customer Programs" so that they may operate their businesses in the ordinary course.  The inability to honor existing business relationships with the Debtors' patrons, horsemen and employees – the three critical components to the businesses– and pay ordinary course business expenses will result in substantial and irreparable harm to the going concern value of the Debtors and would otherwise not be in the best interests of these estates and their creditors.

9.      Part I of this Declaration describes the business of the Debtors and the circumstances surrounding the filing of the Chapter 11 Cases.  Part II sets forth the relevant facts in support of the Debtors' First-Day Motions, and the documents filed concurrently therewith.

## PART I - BACKGROUND

### A.    Balmoral Park

10.    Balmoral owns and runs its races at Balmoral Park, located in Crete, Illinois (20 minutes south of Chicago). For almost 90 years, Balmoral Park has been the site one of the most historic horse racing venues in the country.  The original facilities, built in 1925, were known as "Lincoln Fields." In 1955, the "Balmoral Jockey Club" was organized, acquired Lincoln Fields and changed the name of the racetrack to "Balmoral Park."  During its 88 year history, the racetrack has conducted both thoroughbred and harness racing. Since 1991, Balmoral has conducted only harness racing.

11.    Balmoral Park has a one-mile track, equipped with lights for night racing. The track is capable of seating approximately 10,000, and includes stabling for over 1,000 horses. In addition to hosting harness races, Balmoral offers various dining accommodations and special event facilities at the racetrack.

### B.    Maywood Park

12.    Maywood leases the land where it runs its races, Maywood Park, located in Melrose Park, Illinois (ten miles west of the Chicago Loop).  Maywood also subleases a portion of the leased property to a commercial development.  For almost 82 years, Maywood Park has been the site one of the most historic horse racing venues in the country.  Originally the home of the Cook County Fairgrounds, non-wagering harness racing began in 1932. The first racetrack was built on the site when Maywood Park was issued Illinois' first harness racing license in 1946. Maywood is the only Chicagoland racetrack which was been solely devoted to harness racing. Since 1946, Maywood Park has conducted standardbred harness races for 68 consecutive seasons, the longest in state history.

13. Maywood has a half-mile limestone racetrack, equipped with lights for night racing. The track is capable of seating approximately 10,000, and includes stabling for over 980 horses. In addition to hosting harness races, Maywood Park offers various dining accommodations and special event facilities.

C.     **General Overview**

14. Estimated combined annual revenues for 2014 for Balmoral and Maywood will be approximately $23.3 million (Balmoral estimated revenue of $13.2 million, and Maywood estimated revenue $9.1 million).

15. Presently, Balmoral and Maywood have directly, in the aggregate, approximately 241 employees (Balmoral - 141; Maywood - 100), including members of various unions, consisting of office personnel, marketing and sales, outside maintenance, track crew, security, admission, inside maintenance, race office, emergency medical technicians, program sales, cameramen and pari-mutuel clerks.

16. The Companies are the engine that drives thousands of additional jobs. For the year ending December 31, 2014, Balmoral and Maywood collectively will have run approximately 2,195 races involving some 2,000 different horses and thousands of horsemen (trainers, drivers, caretakers, *etc*.).

D.     **Harness Racing**

17. Harness racing is a type of horse racing where a standardbred horse pulls a light two wheeled cart called a "sulky" with a driver. While the origins of harness racing can be traced back to ancient times, modern harness racing began to evolve in the early 19th century. Standardbred horseraces differ from thoroughbred horseraces (where the jockey sits astride the horse on a saddle).

18.     Harness racing is run in various countries throughout the world. In the U.S., pari-mutuel betting raceways in Illinois, New York, Pennsylvania, Ohio, California, New Jersey and Florida, among other states, dominate the sport, with locations in major cities and state and county fairs. Generally, harness racing is at night and thoroughbred racing in the afternoon.

### E.     Pari-Mutuel Wagering at Racetracks and OTBs

19.     The Debtors' primary revenues come from pari-mutuel wagering on the races run at their tracks and the off-track betting system. The word "pari-mutuel" is French meaning "among ourselves." Pari-mutuel wagering is where the track – other than ensuring the integrity of the race – has no interest in which horses win or lose, but only acts as an agent. The track holds the money wagered until the finish of the race and pays the winning ticket holders the proper amount of the tickets determined by the type of wagers selected by the customer.  Pari-mutuel wagering became legal in Illinois on July 1, 1926.

20.     Today, pari-mutuel wagering in Illinois can be made on site at the track for races run at the track or by "simulcast," which is via closed circuit television at the track for races run at other tracks located throughout the country. In Illinois, simulcasts are also conducted at off-track betting parlors ("OTB") locations in the Chicago metropolitan area and elsewhere (there are 27 in total).  Balmoral owns and operates three (3) OTBs and Maywood owns six (6), which are operated by a separate company, Coast to Coast Food Service, Inc., an Illinois corporation that also handles food service at both of the Debtors' tracks.  Illinois became the first state to permit race tracks to own and operate an OTB. Balmoral opened up Illinois's first OTB in Peoria in 1987.  In addition, Balmoral and Maywood's simulcast "signal" broadcasts races to approximately 3,000 separate locations worldwide.

21.     Illinois' OTBs are each owned by one of the five (5) Illinois horse racing licensees, or their affiliates - (a) Balmoral; (b) Maywood; (c) Arlington International Racecourse, LLC located in Arlington Heights, IL ("Arlington"); (d) Hawthorne Race Course, Inc., located in Stickney, IL ("Hawthorne"); and (e) Fairmount Park, Inc. located in Collinsville, Illinois. ("Fairmount," and together with the Debtors, Arlington and Hawthorne, the "Tracks").   Out of all the Tracks, only the Debtors run harness racing, each having different length tracks.  The other three Tracks run only thoroughbred racing.

22.     Unlike thoroughbred racing which is run only during Spring, Summer and Fall in Illinois, harness racing at the Balmoral Park and Maywood Park are operated year round.  Since 1998, the Debtors have operated a coordinated racing schedule approved by the Illinois Racing Board.

23.     Maywood and Balmoral also operate pari-mutuel harness racing at the two annual Illinois state fairs, plus the Brown County fair. These are the only other locations with pari-mutuel harness racing in Illinois.

**F.      Horse Racing is a Highly Regulated Industry**

24.     The Debtors operate pari-mutuel wagering at the Balmoral Park and Maywood Park racetracks under a license granted by the State of Illinois pursuant to the Illinois Horse Racing Act of 1975, 230 ILCS 5/1 et seq. (the "Horse Racing Act").

25.     The Illinois Racing Board (the "IRB") was created in 1933 and its legal mandate is defined in the Horse Racing Act. The jurisdiction, supervision, powers, and duties of the IRB extend under the Horse Racing Act to the Debtors and every person who holds or conducts any race meeting within the State of Illinois where horse racing is permitted for any stake, purse or reward. As stated on their webpage (http://www.illinois.gov/irb), the mission of the IRB is to

regulate horse racing through the enforcement of the Horse Racing Act and its rules and

regulations and to ensure the honesty and integrity of Illinois racing and wagering. The IRB

holds regular and special meetings as may be necessary to perform properly and effectively all

duties under the IRB.

26.     Under the Horse Racing Act, race licensees such as the Debtors, who collect the

bets and conduct harness horse races, split a portion of all bets with the horsemen, who own,

train, and race the horses, among other things. The horsemen that race at the Debtors' tracks are

represented by the Illinois Harness Horsemen's Association (the "IHHA"), an Illinois

corporation.

27.     The total amount of all bets placed on a race is commonly referred to as the

handle (the "Handle").  The portion of the bets allocated to the horsemen is referred to as the

purse (the "Purse").  Certain of the funds used to pay the horsemen are maintained by a

licensee in a segregated Purse account.

28.     The Horse Racing Act and the IRB collectively regulate and control the

procedures for all aspects of the racing and wagering process, with respect to races held at the

tracks and the wagers at the OTBs.  This regulation extends to issuing licenses; establishing a

race schedule for all of the Illinois racetracks; and the collection and distribution of the state

taxes, Handle and the Purse, which is then subject to further contractual agreements among the

racetrack licensees and the horsemen.  Specifically, the funds from the Purse account are

distributed to the horsemen based on separate agreements between the licensee and the

horsemen.  The IHHA (on behalf of the horsemen) and the Debtors have entered into a written

agreement that governs this business relationship as of the filings of the Petition Date and

continuing through June 30, 2015.

G.    **Tracks' Current Ownership and Management**

29.    In 1979, William H. "Billy" Johnston, Jr., the current Chairman of the Boards of

Directors of both of the Tracks, acquired a significant minority position in Maywood and became

actively involved in their management and operation.  George Steinbrenner's

family subsequently acquired a large minority position, and Billy Johnston and his sons, John A.

Johnston and William H. "Duke" Johnston III, took over as the full time operators of Maywood.

30.    In 1987, Balmoral Park was sold to George Steinbrenner's family and a group of

local track operators headed by Billy, John and Duke Johnston.  The new ownership turned

Balmoral into a thoroughbred and harness racing venue, which it remained until 1991 when

Balmoral became exclusively a harness racing track.

31.    In 2011, a group headed by the Johnstons acquired the Steinbrenners' interests in

the Debtors. Presently, 100% of the issued and outstanding stock in both Debtors is held by a

holding company, World Wide Wagering, Inc., a Delaware corporation ("World Wide"). World

Wide is owned by a number of individuals, trusts and entities, of which the Johnston family

owns and/or controls over 60% and the owners of Hawthorne own and/or control approximately

10%.

32.    Presently, the Board of Directors for each of World Wide, Balmoral and

Maywood consist of the same group of seven (7) individuals, including Billy, as Chairman, John

and Duke, and four outside directors. John is Balmoral's President. Duke is the President of

Maywood.  I serve as the Chief Operating Officer and Chief Financial Officer for both of the

Debtors.  Balmoral and Maywood share many common employees and operations, which are

allocated between the two companies, and allow for numerous cost savings and other operational

efficiencies.

**H.**      **The Johnstons**

33.      The Johnstons' roots in horse racing began in 1931 and have always been in the

Chicagoland area, with harness and thoroughbred racing being their primary occupations and

business.

34.      In 1931, following the Great Depression of 1929, William H. Johnston, Sr. went

to work at Sportman's Park Racetrack in Cicero as an entry level employee. Through the years,

he rose through the ranks to General Manager, then to President, and ultimately to a minority

ownership position. He died in 1977. Until 1949, Sportsman's Park only ran thoroughbred

racing. From 1949 - 1998, Sportman's became a thoroughbred and harness racing

venue.  Sportman's then undertook a major expansion converting their track to a dual purpose

venue to host thoroughbred and open wheel (CART) racing. Billy Johnston resigned from his

management at Sportman's at approximately this time. Sportman's ran thoroughbred and car

races from 1999 - 2001. The combination proved unsuccessful and Sportsman's closed

permanently in 2002.

35.      Billy Johnston became involved with Sportman's Park in 1953 working, while a

college student, during the summer harness racing meet. Upon graduating in 1957, he became

more involved in all aspects of the business and racetrack operation, including construction,

maintenance, food and beverage, thoroughbred and harness racing, state regulations and other

matters. Billy has owned and operated a thoroughbred and standardbred horse breeding farm in

Illinois. He was a pari-mutuel harness driver, and owned and trained standardbred and

thoroughbred horses for many years.

36.      Duke Johnston and John Johnston, Billy's sons, continued the long family

tradition and like their father, have also spent their entire professional careers in the horse racing

industry. Coming up through the ranks and into the leadership roles they hold today, Duke was a

harness driver, and John was a leading young jockey at all of the Chicago area thoroughbred

tracks.

I.      **Events Leading to the Chapter 11 Filing**

37.     Chicagoans have enjoyed horse racing since the early 1830s and by the 1930s

had more horse racing tracks than any other metropolitan area in the United States.

38.     Section 1.2 of the Horse Racing Act states that the legislative intent is to "benefit

the people of the State of Illinois by assisting economic development and promoting Illinois

tourism." The Illinois General Assembly further found that it is the public policy of the State of

Illinois to, *inter alia*, "(a) support and enhance Illinois' horse racing industry, which is a

significant component within the agribusiness industry; ... (c) stimulate growth within Illinois'

horse racing industry, thereby encouraging new investment and development to produce

additional tax revenues and to create additional jobs;... and (f) ensure that public confidence and

trust in the credibility and integrity of racing operations and the regulatory process is

maintained."

39.     Despite all of the benefit brought about by the horse racing industry, since 1992

(the first full year of riverboat operations in Illinois), the proliferation of river boat gambling

casinos, video lottery terminals and "racinos" (racetracks that also have casino-style gaming on

site) in most other states has seriously impaired the ability of Maywood, Balmoral and all of the

other Tracks to operate profitably.

40.     To offset the declining revenues in the Illinois horse racing industry, the Tracks

have sought for over 25 years to have slot machines permitted at their respective racetracks. The

Tracks believe the additional revenues the slots would generate would allow each of the Tracks

to operate profitably. To date, efforts to obtain legislation allowing slots at the Tracks have been

unsuccessful.  Currently there are approximately 45 tracks located in 14 states (other than

Illinois) that have additional forms of casino-style gambling available.

      **(1)     The Racing Act of 2006 and 2008**

      41.     In the absence of legislation authorizing casino-style gaming, to protect the

horseracing industry and maintain and grow the economic benefit derived from Illinois horse

racing, in 2006, Illinois passed a law (the "2006 Racing Act") imposing a 3% tax on the four

largest riverboat casinos in Illinois - Empress Casino in Joliet, Harrah's Casino in Joliet, Grand

Victoria Casino in Elgin and Hollywood Casino in Aurora (collectively, the "Riverboats"). In

2008, the Racing Act was extended for an additional three (3) years (the "2008 Racing

Act").  The possibility of 2015 legislative relief in whatever form for the horse racing industry in

Illinois remains.

      42.     Part of the legislative findings contained in the 2006 and 2008 Racing Acts

concluded that riverboat operations in Illinois negatively impacted the State of Illinois' horse

racing industry in a direct and profound manner, and a result, the State of Illinois' breeding

industry, agriculture and other businesses also suffered.  Among other things, the Acts found:

> (a) That Illinois agriculture and other businesses that support and supply the horse racing industry, already a sector that employs over 37,000 Illinoisans, also stand to substantially benefit and would be much more likely to create additional jobs should Illinois horse racing once again become competitive with other states; and

> (b) That the 3% of gross revenues this amendatory Act of the 94th General Assembly will contribute to the horse racing industry will benefit that important industry for Illinois farmers, breeders, and fans of horseracing and will begin to address the negative impact riverboat gaming has had on Illinois horseracing.

*See Empress Casino Joliet Corp. v. Giannoulias*, 231 Ill. 2d 62, 67, 896 N.E.2d 277, 283 (2008)

(citing Pub. Act 94–804, § 1, eff. May 26, 2006).

43.     On May 30, 2006, the Riverboats filed a complaint in the Circuit Court of Will County, in the case styled *Empress Casino Joliet Corp., et al. v. Giannoulias*, No. 06 CH 1294, challenging the constitutionality of the 2006 Racing Act under the Due Process and Uniformity Clauses of the United States and Illinois Constitutions, respectively.  Maywood and Balmoral intervened to defend the legislation, and argued their motion to dismiss the Riverboats' complaint before both the Circuit Court and the Illinois Supreme Court (*Empress Casino Joliet Corp., et al. v. Giannoulias*, No. 06 CH 1294, Complaint).

**(2)     Illinois Supreme Court unanimously upheld the 2006 and 2008 Racing Acts**

44.     On June 5, 2008, the Illinois Supreme Court unanimously affirmed the constitutionality of the 2006 Racing Act on all bases, and dismissed the Riverboats' complaint.  *Empress Casino Joliet Corp. v. Giannoulias*, 231 Ill. 2d 62 (2008).  Rejecting the Casinos' challenge under the Public Purpose Clause of the Illinois Constitution, the Illinois Supreme Court recognized:

> While it may be true the proceeds go directly to the track owners, the manner in which the owners must utilize the funds is controlled by statute. The Act specifically states how the money must be used:  60% goes to the tracks as purses and 40% goes to the tracks "to improve, maintain, market, and otherwise operate [their] racing facilities to conduct live racing, which shall include backstretch services and capital improvements related to live racing and the backstretch."  The track owners cannot simply pocket any of the funds they receive, not even the 40%.  The 40% is earmarked for specific purposes and must be used by the racks for those purposes.
>
> ****
>
> Certainly, the principal purpose of the Act is a public one:  to stimulate economic activity, including the creation and maintenance of jobs and the attraction and retention of sports and entertainment, particularly betting on horse racing.  We conclude that the Act does, in fact, serve a public purpose.  The surcharge will benefit the general well-being of society and the prosperity of the people of the State of Illinois.  The emphasis of the Act is to benefit the entire horse racing industry, not simply the track owners, and the collateral businesses associated with that industry.  The surcharge will serve to reduce the costs of unemployment

and the evils attendant thereto should the industry collapse and the 35,000-plus associated jobs lost. The ultimate result of the surcharge will encourage an increase in industry in this state, including farming, breeding, and training, will stimulate commercial growth, and will revitalize an economically stagnant industry. All of these are objects that enhance the public "weal." Illinois has a strong interest in preserving the viability of industries in this state, which in turn will benefit the economy of the state as a whole.

*Id.* at 88-89 (internal citations omitted).

45.     Following the passage and enactment of the 2008 Racing Act, the Riverboats again immediately filed a lawsuit in the Circuit Court of Will County challenging the constitutionality of the 2008 Racing Act. The Riverboats once again argued that the tax violated the Illinois Constitution's Uniformity Clause, as the legislature applied the 3% tax only to Illinois casinos receiving adjusted gross receipts in excess of $200 million in 2004. Although the Illinois Supreme Court had unanimously rejected the same challenge, under the same clause of the Illinois Constitution, with respect to the 2006 Racing Act, the Riverboats attempted to circumvent that ruling by arguing that the legislature's continued reliance on 2004 figures in 2008 violated the Illinois Constitution. The Circuit Court of Will County rejected that argument, finding it foreclosed by the Illinois Supreme Court's ruling in *Giannoulias*. The Third District unanimously affirmed that ruling on appeal and in May 2011, the Illinois Supreme Court denied the Casinos' petition for leave to appeal, effectively terminating the Riverboats' constitutional challenge to the 2008 Act.

**(3)     The Riverboat filed new litigation directed against the Debtors**

46.     The U.S. Supreme Court denied the Riverboats' petition for *certiorari* from the Illinois Supreme Court's unanimous decision on June 8, 2009. *Empress Casino Joliet Corp v. Giannoulias*, 556 U.S. 1281 (2009). According to deposition testimony, one of the Riverboats, Harrah's Casino, then "made a decision to file [a new] complaint when it looked like

our previous lawsuit was going to be concluded and we wanted to move to protect our

assets." (Maddox Dep., Ex. 16, 146:17-22).

47.     Having failed to have either the 2006 or 2008 Racing Acts invalidated by the

Illinois state courts, the Riverboats filed suit in the U.S. District Court for the Northern District

of Illinois, Eastern Division (Case No. 09-CV-03585) against Balmoral, Maywood, Arlington,

Hawthorne and John, among others, alleging various theories of recovery, including an

alleged scheme involving former Governor Rod Blagojevich and the 2008 Racing Act

notwithstanding that the 2006 Racing Act had been upheld by the Illinois Supreme

Court (the "Riverboat Litigation").

48.     In August 2013, District Court granted the Debtors' and John's motion for

summary judgment, concluding that the Riverboats had failed to offer sufficient evidence that the

defendants' actions proximately caused the Riverboats' alleged harm and completely terminated

the case in favor of the defendants.  The Riverboats appealed that decision and on August 14,

2014, the United States Court of Appeals for the Seventh Circuit affirmed in part, and reversed in

part, the District Court's ruling. *Empress Casino Joliet Corp v. Johnston*, 763 F3d 723 (7th Cir

2014). Specifically, the Seventh Circuit held with respect to the 2006 Racing Act, the Riverboats

had offered neither sufficient evidence that the racetracks proximately caused the 2006 Act's

enactment, nor sufficient evidence that defendants engaged in any wrongdoing at all.  With

respect to the 2008 Racing Act, however, the Seventh Circuit held that there was a dispute of fact

as to whether defendants promised to pay Blagojevich a bribe to sign the 2008 Act into law.  The

Seventh Circuit held further that if such evidence were accepted, this would be sufficient to

establish that the racetracks proximately caused the Riverboats' alleged harm.  The Seventh

Circuit thus vacated the District Court's ruling as to the 2008 Racing Act, and remanded the case back for further proceedings.

49.     After a week-long jury trial, on December 11, 2014, a judgment was entered in favor of the Riverboats against the Balmoral, Maywood and John, jointly and severally, in excess of $75 million ("Judgment"). Representatives of Balmoral, Maywood and John intend to contest the Judgment and will file a post-judgment motion and/or appeal within the appropriate time periods (the "Appeal").

50.     Under Rule 62 of the Federal Rules of Civil Procedure, the Riverboats were prohibited from exercising any of their post-judgment collection remedies against the Balmoral, Maywood and John for 14 days from and after the entry of the Judgment. Such 14-day period would have expired on December 25, 2014.

51.     Efforts by the Balmoral, Maywood and John to obtain a consensual standstill period before the expiration of the 14-day stay with the Riverboats to allow for settlement negotiations proved unsuccessful.  The judgment debtors do not have the economic wherewithal to post the necessary bond pending the Appeal to forestall collection efforts.

52.     The Debtors therefore commenced these Chapter 11 Cases to stay the Judgment and in order to protect the value of their assets and business for the benefit of all of their creditors, employees, and other interested parties. The Debtors believe they can successfully restructure their obligations under the provisions of the Bankruptcy Code, and intend to propose a plan of reorganization and successfully emerge from these Chapter 11 Cases.

**PART II - DEBTORS' FIRST-DAY MOTIONS AND MOTIONS TO BE FILED IN THE FIRST SEVERAL WEEKS OF THE CHAPTER 11 CASES**

**A.**     **Cash Management**

53.     The Debtors' cash management system is managed by responsible individuals under my direction at the Debtors' respective principal offices, with most of such management being conducted at Maywood, where my office is located. Through utilization of the cash management system, the Debtors are able to facilitate cash forecasting and reporting, monitor collection and disbursement of funds, and maintain control over the administration of various bank accounts required to effect collection, disbursement, and movement of cash. I believe that the movement of funds through the Debtors' cash management system as described herein and in the relevant motion is accurate.

54.     As part of their cash management system, the Debtors have established disbursement and deposit accounts in the operation of their business (the "Bank Accounts"). All Bank Accounts are maintained at First Merit Bank ("First Merit").

55.     I believe that the Bank Accounts constitute an integral component of the Debtors' operations, and that the Debtors should seek a waiver of the United States Trustee's requirement that such accounts be closed and that new postpetition bank accounts be opened. If enforced, I believe the requirement will cause unnecessary disruption to the Debtors' ability to maximize the value of their estates. If such relief is not granted, the Debtors will suffer significant harm resulting from the termination of the present system and the inherent delay in establishing postpetition systems and procedures governing the use and application of the Debtors' funds. In addition, because of the Debtors' integrated financial structure, it would not be possible to establish a new system of accounts and a new cash management and disbursement system without substantial additional costs and expenses to the bankruptcy estate.

56.     To protect against inadvertent payment of prepetition claims, the Debtors'

personnel and the personnel at First Merit with whom the Debtors customarily deal will be

instructed how to distinguish readily between prepetition and postpetition obligations without

closing existing accounts and opening new ones.  To ease the task of distinguishing between

prepetition date and postpetition date checks, I believe that the Debtors will be able to leave a

gap in their respective check numbers such that checks preceding the gap will be readily

identifiable as prepetition checks and the checks following the gap will be readily identifiable as

postpetition checks.

57.     I believe that due to the nature and scope of the Debtors' businesses and the

numerous suppliers of goods and services and others with whom the Debtors transact business,

the Debtors must also seek authority to continue their use of existing business forms,

correspondence and checks without alteration or change.  Changing correspondence and business

forms would be unnecessary, would be burdensome to the Debtors' estates, would result in

undue expense and would be disruptive to the Debtors' ongoing business operations.

58.     If the Debtors are not permitted to continue to use their existing business forms,

the resulting prejudice will include significant delay in the administration of the Debtors'

business operations and the imposition of an unnecessary cost to the Debtors' estates to print

new business forms.

59.     Similarly, the Debtors must seek authority to continue to use their existing books

and records to minimize expense to their estates.  I believe that opening new books and records

would be burdensome to the estates and disruptive to the Debtors' business operations.  The

Debtors have fully functioning systems that thoroughly and accurately account for all cash and

track the Debtors' financial performance.  Changing the current system would be costly and

would greatly increase the potential for error.

**B.**      **Prepetition Wages, Benefit and Insurance Coverage**

60.      I understand and believe that the description of the prepetition wage claims,

benefits and related employee obligations discussed herein and further set forth in detail in the

relevant motion is accurate.

61.      There exists a critical need for the Debtors immediately to pay certain prepetition

wage claims of the Debtors' Employees, including outstanding wages and wage-related benefits,

all related withholdings and taxes, accrued reimbursable business expenses and prepetition

claims arising in connection with the Debtors' employee health and life insurance (collectively,

the "Prepetition Employee Obligations").  The satisfaction of these Prepetition Employee

Obligations is critical to the Debtors' ability to retain qualified employees to continue to operate

their businesses for the benefit of their creditors and other interested parties in the Chapter 11

Cases.  As noted above, as of the Petition Date, the Debtors collectively employ approximately

241employees, approximately 40 of whom are union employees covered by collective bargaining

agreements.

62.      As of the Petition Date, Prepetition Wage Claims owing to the Employees and

relating to prepetition periods encompass a very limited period of three (3) days: December 21 –

23, 2014.

63.      The Debtors intend to maintain their existing insurance coverage for their

Employees during the pendency of these Chapter 11 Cases, as detailed in the underlying motion.

The Debtors believe that the payment of limited prepetition amounts to satisfy in full the

Prepetition Employee Obligations is critical to retaining their Employees in order to maintain the

Debtors' going-concern values as they pursue the rehabilitation of their respective affairs under the supervision of this Court.

64.      No Employees are owed in excess of the $12,475 limit provided under Sections 507(a)(4)-(5) of the Code.

**C.      Customer Programs**

65.      Prior to the commencement of the Chapter 11 Cases, the Debtors developed programs and policies designed to foster and maintain positive relationships with their customers (the "Customers"). These types of programs (collectively, the "Customer Programs") were conducted in the ordinary course of the Debtors' businesses and are customary in the horse racing and wagering industry in Illinois and nationally. The relevant terms of the Customer Programs are detailed in the First Day Motion.

66.      Specifically, the Customer Programs were designed to ensure customer satisfaction, develop and sustain customer loyalty, and generate goodwill for the Debtors and their races. At the same time, the Customer Programs enabled the Debtors to meet competitive pressures, improve profitability, and ultimately enhance net income.

67.      The continuity, viability, and revitalization of the Debtors' businesses is dependent upon maintaining the loyalty of their Customers and the Horsemen, which has been developed on an on-going basis over the past several decades.  The Debtors must be permitted to continue their Customer Programs and honor any prepetition obligations arising therefrom to ensure customer loyalty.  It is self-evident that a horse racetrack must be able to attract and maintain wagering patrons and horsemen to survive.  If the Debtors fail to honor their obligations to these essential parties, the Debtors' rehabilitative efforts will be severely undermined.

68.     In addition, the Debtors are concerned that the commencement of these Chapter 11 Cases could itself have a negative impact on their Customers' and the Horsemen's attitudes towards their races and create doubt as to their ability to continue to host such races. Accordingly, the Debtors must quickly assure their Customers and Horsemen of their ability to fulfill their obligations under the prepetition Customer Programs to maintain the valuable relationship that are the core of the Debtors' business.  The Debtors therefore must be permitted to satisfy their prepetition obligations arising under the Customer Programs in order to maintain their existing customer base and preserve their goodwill on a going-forward basis by continuing these Customer Programs post-petition.

69.     Finally, the Debtors submit that the resulting benefit of continued customer satisfaction and loyalty during the pendency of these Chapter 11 Cases will far exceed the cost of such Customer Programs.  The Debtors submit that the largest potential prepetition obligations arise from the Outs, and they have sufficient resources available to satisfy such obligations as evidenced by the segregated Outs' accounts and the funds maintained therein.

## PART III - CONCLUSION

70.    In order to minimize any loss to the value of the Companies' businesses and to

maximize the benefit of the Companies' creditors, estates and parties in interest, Balmoral's and

Maywood's immediate objective is to engage in business as usual following the commencement

of the Chapter 11 Cases, with as little interruption to its operations as possible.  I believe that if

the Court grants the relief requested in each of the First-Day Motions and other motions to

follow, the prospect of achieving such objective, and thus the potential of a reorganization of the

Debtors' affairs, will be substantially enhanced.


Respectfully Submitted,

BALMORAL RACING CLUB, INC. and
MAYWOOD PARK
TROTTING ASSOCIATION, INC.

By: _____
          Randall Olech
          Chief Operating Office and
          Chief Financial Officer


CHAD H. GETTLEMAN, ESQ. (ARDC #944858)
NATHAN Q. RUGG, ESQ. (ARDC #6272969)
ALEXANDER F. BROUGHAM, ESQ. (ARDC #6301515)
ADELMAN & GETTLEMAN, LTD.
53 West Jackson Blvd., Suite 1050
Chicago, Illinois 60604
Tel (312) 435-1050
Fax (312) 435-1059
**Proposed Counsel for the Debtors**