## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BALMORAL RACING CLUB, INC., *et al.*, | ) | Case No. 14-45711 |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Honorable Donald R. Cassling |
| | ) | |
| | ) | **Hearing Date: October 25, 2016** |
| _____ | ) | **Hearing Time: 9:30 a.m.** |

## NOTICE OF MOTION

TO:     See attached service list

   **PLEASE TAKE NOTICE** that on **Tuesday, the 25th day of October, 2016, at 9:30 a.m.**, or as soon thereafter as counsel may be heard, we shall appear before the Honorable Donald R. Cassling of the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, or any judge sitting in his place and stead, in Courtroom 619 of the Dirksen United States Courthouse, 219 South Dearborn Street, Chicago, Illinois, and then and there present that certain **MOTION OF ADELMAN & GETTLEMAN, LTD. FOR ALLOWANCE OF FINAL COMPENSATION AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO BALMORAL RACING CLUB, INC. AND MAYWOOD PARK TROTTING ASSOCIATION, INC.**, a copy of which is attached hereto and hereby served upon you.

CHAD H. GETTLEMAN, ESQ. (ARDC #944858)
NATHAN Q. RUGG, ESQ. (ARDC #6272969)
ALEXANDER F. BROUGHAM, ESQ. (ARDC #6301515)
**ADELMAN & GETTLEMAN, LTD.**
53 West Jackson Boulevard, Suite 1050
Chicago, Illinois 60604
Telephone: (312) 435-1050
Facsimile: (312) 435-1059
**Counsel for the Debtors**

## CERTIFICATE OF SERVICE

   The undersigned, an attorney, hereby certifies that a true copy of the foregoing Notice of Motion and the document referred to therein were served upon the persons listed on the attached Service List via ECF, unless otherwise indicated, this 5th day of October, 2016.

/s/ Chad H. Gettleman_____
Chad H. Gettleman, Esq.

## SERVICE LIST

**VIA ECF**:
Robert Andalman, Esq.
A&G Law LLC
542 South Dearborn, 10th floor
Chicago, IL   60605
FAX:   312-341-0700
randalman@aandglaw.com
  and
Andrew R. Greene, Esq.
A&G Law LLC
542 South Dearborn, 10th floor
Chicago, IL   60605
FAX:   312-341-0700
agreene@aandglaw.com
  and
Rachael Blackburn
A&G Law LLC
542 South Dearborn, 10th floor
Chicago, IL   60605
FAX:   312-341-0700
rblackburn@aandglaw.com
FAX:   312-341-0700
  and

Michael M. Eidelman, Esq.
Vedder Price P.C.
222 North LaSalle Street, suite 2600
Chicago, IL   60601
FAX:   312-609-5005
meidelmam@vedderprice.com
  and
Douglas J. Lipke, Esq.
Vedder Price P.C.
222 North LaSalle Street, suite 2600
Chicago, IL   60601
FAX:   312-609-5005
dlipke@vedderprice.com
*represent Empress Casino Joliet Corporation*
*Des Plaines Development Limited  Partnership*
*Hollywood Casino-Aurora, Inc.*
*Elgin Riverboat Resort-Riverboat Casino*

Eric S. Rein, Esq.
Horwood Marcus & Berk, Chartered
500 West Madison, suite 3700
Chicago, IL   60661
FAX:   312-606-3232
rrein@hmblaw.com
  and

Jason M. Torf, Esq.
Horwood Marcus & Berk, Chartered
500 West Madison, suite 3700
Chicago, IL   60661
FAX:   312-606-3232
jtorf@hmblaw.com
*represent FirstMerit Bank, N.A.*

Joseph D. Frank, Esq.
FrankGecker LLP
325 North LaSalle, Suite 625
Chicago, IL   60654
FAX:   312-276-0035
jfrank@fgllp.com
  and
Frances Gecker, Esq.
FrankGecker LLP
325 North LaSalle, suite 625
Chicago, IL   60654
FAX:   312-276-0035
fgecker@fgllp.com
*represent Illinois Harness Horsemen's Association*

F. Kevin Murnighan, Esq.
Carey Filter White & Boland
33 West Jackson, 5th floor
Chicago, IL   60604
FAX:   312-939-4285
kevin@careyfilter.com
*represents Hawthorne Race Course, Inc.*

Scott R. Clar, Esq.
Crane, Heyman, Simon, Welch & Clar
135 South LaSalle, suite 3705
Chicago, IL   60603
FAX:   312-641-7114
sclar@craneheyman.com
  and
Jeffrey C. Dan, Esq.
Crane, Heyman, Simon, Welch & Clar
135 South LaSalle, suite 3705
Chicago, IL   60603
FAX:   312-641-7114
jdan@craneheyman.com
  and
Brian P. Welch, Esq.
Crane, Heyman, Simon, Welch & Clar
135 South LaSalle, suite 3705
Chicago, IL   60603
FAX:   312-641-7114
bwelch@craneheyman.com
*represent John A. Johnston*

Robert J. Brown, Esq.
Wyatt, Tarrant & Combs, LLP
500 West Jefferson Street, suite 2800
Louisville, KY   40202-2898
FAX:   859-259-0649
rbrown@wyattfirm.com
*represents Churchill Downs, Incorporated,*
*600 North Hurstbourne Parkway, suite 400*
*Louisville, Kentucky   40222*

Daniel I. Waxman
Wyatt, Tarrant & Combs, LLP
250 West Main Street, suite 1600
Lexington, KY   40507-1746
FAX:   859-259-0649
dwaxman@wyattfirm.com
*represents Churchill Downs, Incorporated,*
*600 North Hurstbourne Parkway, suite 400*
*Louisville, Kentucky   40222*

Eric T. Stach, Esq.
Del Galdo Law Group, LLC
1441 South Harlem Avenue
Berwyn, IL   60402
FAX:   708-222-7001
stach@dlglawgroup.com
*represents Village of Melrose Park*

Robert M. Charles, Jr.
Lewis Roca Rothgerber LLP
3993 Howard Hughes Parkway, suite 600
Las Vegas, NV   89169
FAX:   702-949-8398
RCharles@LRRLaw.com
*represents Nevada Pari-Mutuel Association*

Patrick S. Layng, Esq.
Office of the U.S. Trustee
Region 11
219 S. Dearborn Street, Room 873
Chicago, IL 60604
FAX: 312-886-5794

Micah R. Krohn
FrankGecker LLP
325 North LaSalle, Suite 625
Chicago, IL   60654
FAX:   312-276-0035
mkrohn@fgllp.com
*Illinois Harness Horsemen's Association*

Robert Lynch
Office of the Illinois Attorney General
100 West Randolph
Chicago, IL   60061
robert.lynch2@illinois.gov

William J. McKenna
Foley & Lardner LLP
321 North Clark, suite 2800
Chicago, IL   60654
FAX: 312/832-4700
wmckenna@foley.com

Meredith Shippee
Foley & Lardner LLP
321 North Clark, suite 2800
Chicago, IL   60654
FAX: 312/832-4700
mshippee@foley.com

Steven D. Mroczkowski
Sosin & Arnold, Ltd.
9501 West 144th Place, suite 205
Orland Park, IL   60462
FAX:   708/448-8140
SMroczkowski@sosinarnold.com
*represents The Village of Crestwood*

Michael J. Dudek
Leo & Weber, P.C.
One North LaSalle Street, suite 3600
Chicago, IL   60602
FAX:   312/857-1240
MWeber@leoweber.com
and
T. Scott Leo
Leo & Weber, P.C.
One North LaSalle Street, suite 3600
Chicago, IL   60602
FAX:   312/857-1240
SLeo@leoweber.com
*represent Westchester Fire Insurance Company*

William J. Barrett
Barack Ferrazzano Kirschbaum & Nagelberg LLP
200 West Madison Street, suite 3900
Chicago, IL   60605
FAX:   312/984-3150
william.barrett@bfkn.com
*represents:*
*1.   Bank of America as trustee under trust*
    *agreement known as the Arthur T. Galt Jr. Trust*
    *dated February 16, 1967;*
*2.   Bank of America, as trustee under trust*
    *agreement known as the Raymond M. Galt Jr.*
    *Trust dated February 16, 1967; and*
*Bank of America, as trustee under Trust Agreement*
*known as the William C. Galt Trust dated*
*February 16, 1967*

John W. Guzzardo
Shaw Fishman Glantz & Towbin LLC
321 North Clark Street, Suite 800
Chicago, IL  60654
*represents Crum & Forster Indemnity Company*
jguzzardo@shawfishman.com

Robert M. Fishman
Shaw Fishman Glantz & Towbin LLC
321 North Clark Street, Suite 800
Chicago, IL  60654
*represents Crum & Forster indemnity Company*
rfishman@shawfishman.com

Steven B. Towbin
Shaw Fishman Glantz & Towbin LLC
321 North Clark Street, Suite 800
Chicago, IL  60654
*represents Crum & Forster Indemnity Company*
stowbin@shawfishman.com

Peter J. Roberts
Shaw Fishman Glantz & Towbin LLC
321 North Clark Street, Suite 800
Chicago, IL  60654
*represents Crum & Forster Indemnity Company*
proberts@shawfishman.com

Paige E. Barr
Katten Muchin Rosenman LLP
535 West Monroe Street
Chicago, IL 60661
Paige.barr@kattenlaw.com
*Represents Melrose Properties Ltd.*

Jeffrey A. Krol
Johnson & Krol, LLC
300 S. Wacker Drive, suite 1313
Chicago, IL  60606
jeffkrol@johnsonkrol.com
*represents Chicagoland Race Meet Operators and Local 134 I.B.E.W. Joint Pension Trust*

Joseph E. Mallon
Johnson & Krol, LLC
300 S. Wacker Drive, suite 1313
Chicago, IL  60606
mallon@johnsonkrol.com
*represents Chicagoland Race Meet Operators and Local 134 I.B.E.W. Joint Pension Trust*

Melinda J. Wetzel
Johnson & Krol, LLC
300 S. Wacker Drive, suite 1313
Chicago, IL  60606
wetzel@johnsonkrol.com
docket@johnsonkrol.com

Jeffrey H. Bergman
Mandell Menkes LLC
1 N. Franklin, Suite 3600
Chicago, IL  60606
jbergman@mandellmenkes.com
ngagen@mandellmenkes.com
docket@mandellmenkes.com
*Represents Teamsters Local Union No. 727 Pension Fund*

Kevin H. Morse
Arnstein & Lehr LLP
120 South Riverside Plaza, Suite 1200
Chicago, IL  60606
khmorse@arnstein.com
*Represents Barry A. Chatz, not individually, but solely as Creditor Trustee of the Creditor Trust*

Barry A Chatz
Arnstein & Lehr LLP
120 South Riverside Plaza Ste 1200
Chicago, IL 60606
312 876-7100
bachatz@arnstein.com
*Represents Barry A. Chatz, not individually, but solely as trustee of the Balmoral Racing Club, Inc. and Maywood Park Trotting Association, Inc. Creditor Trust*

## VIA UPS 2ND DAY AIR ON 10/6/2016

Balmoral Racing Club, Inc.
Maywood Park Trotting Association, Inc.
8600 West North Avenue
Melrose Park, IL 60160

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BALMORAL RACING CLUB, INC., et al., | ) | Case No. 14-45711 |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Honorable Donald R. Cassling |
| | ) | |
| | ) | **Hearing Date and Time:** |
| | ) | **October 25, 2016 at 9:30 a.m.** |

**MOTION OF ADELMAN & GETTLEMAN, LTD. FOR
ALLOWANCE OF FINAL COMPENSATION AND REIMBURSEMENT
OF EXPENSES AS COUNSEL TO BALMORAL RACING CLUB, INC.
AND MAYWOOD PARK TROTTING ASSOCIATION, INC.**

TO:    THE HONORABLE DONALD R. CASSLING
        U.S. BANKRUPTCY JUDGE:

Now come Chad H. Gettleman and Nathan Q. Rugg on behalf of Adelman & Gettleman, Ltd., (**"Movant"**), counsel to Balmoral Racing Club, Inc. (**"Balmoral"**) and Maywood Park Trotting Association, Inc. (**"Maywood"**), debtors and debtors in possession in these jointly administered cases (collectively, the **"Debtors"** or the **"Chapter 11 Cases"**), and request the entry of an order for the allowance and payment of final compensation and reimbursement of ordinary and necessary expenses incurred in connection therewith as counsel to the Debtors, pursuant to Section 330 of the Bankruptcy Code (the **"Code"**) and Bankruptcy Rules 2002 and 2016, and in support thereof, respectfully state as follows:

**I.**

**INTRODUCTION**

This motion (the **"Motion"**) encompasses a period of almost two (2) years from December 24, 2014, the date of the commencement of the Chapter 11 Cases (**"Petition Date"**), through September 30, 2016, which includes the time for the preparation of this Motion, and as to all other services rendered, through August 25, 2016, the "Effective Date" of the "Plan", as

defined below, and represents Movant's final request for compensation in these Chapter 11 Cases.

These Chapter 11 Cases can be broken down into two relatively distinct time periods: (a) the **"Operational Period"**, which lasted from the Petition Date through January 31, 2016, a period of over one year, and as to the "Oakbrook Terrace OTB" and "Crestwood OTB", as defined below, for an additional three (3) months thereafter; and (b) the **"Liquidation Period"**, which largely began on February 1, 2016 as to all assets other than the Oakbrook Terrace and Crestwood OTBs, and has run through the date of this Motion, a period of approximately eight (8) months.

The Chapter 11 Cases presented Movant with a non-stop series of highly different responsibilities and challenges. Horse racing in Illinois is a heavily regulated and complex industry. It involves matters peculiar only to the horse racing business, such as "recapture"; "purse accounts"; "stakes accounts"; "handle"; "host fees"; "outs"; "breakage"; customer vouchers; off-track betting parlors (**"OTBs"**); OTB Handle Taxes; privilege, admission and surcharge taxes; and importing and exporting simulcasts of live races from other in-state tracks and numerous out-of-state tracks located throughout the country. There are regular presentations required to be made at the Illinois Racing Board, the governing body for Illinois harness and thoroughbred horse racing. The Debtors collectively dealt with twenty five (25) different federal, state and local governmental taxing and regulatory agencies. As more fully set forth on the Schedule G's to each of the Debtors' Bankruptcy Schedules on file in the Chapter 11 Cases, the Debtors were collectively parties to approximately 268 executory contracts and unexpired leases (Maywood – 140, and Balmoral - 128). During the Operational Period, the Debtors imported and exported live racing simulcasts to approximately 300 different locations throughout the country and internationally. During the Operational Period, the Debtors had as many as approximately 240 employees and between 80-225 separate pari-mutuel clerks depending on different race dates. There were three separate labor unions.

2

During these Chapter 11 Cases, there were approximately seventy seven (77) different motions filed regarding a host of different matters, of which Movant prepared and filed fifty-five (55). Movant expended substantial and constant efforts to avoid unnecessary delays, costs and uncertainties which would have arisen from contested proceedings. As a result of Movant's diligent efforts, few of the motions filed in the Chapter 11 Cases were contested. At the outset of these Chapter 11 Cases, Movant also reviewed a voluminous amount of documents and information, and assisted in the preparation of approximately 515 pages of highly detailed Bankruptcy Schedules and Statements of Financial Affairs for both of the Debtors. Movant helped the Debtors' management prepare many monthly debtor-in-possession operating reports, of which the first number of months, as often is the case, are difficult for a debtor's management to compile and adjust to the debtor's record-keeping systems. Together with the numerous daily operational legal issues that arose many specific to the horse racing industry, the customary and ordinary Chapter 11 tasks as a debtor's counsel, involvement in settlement efforts with the largest unsecured creditors, and working with many creditors and all key constituencies, the Chapter 11 Cases were effectively full time jobs for Messrs. Gettleman and Rugg for over one and one half (1½) years.

Throughout the Operational Period, Movant worked with the Debtors' management on virtually a daily basis to maintain the Debtors' operations in the ordinary course of their business in order to preserve the going concern value of the Debtors for the benefit of their creditors. During the Liquidation Period, Movant worked with the Debtors' management on often a daily basis to maintain the Debtors' assets and maximize the value of those assets for the benefit of their creditors. Despite the complications caused by the cessation of the Operational Period due to a ruling by the Illinois Racing Board discussed below, Movant's asset sales efforts during the Operational and Liquidation Periods, as more fully described below, helped generate gross sales proceeds to the Debtors' estates of approximately $3,701,512.00. Prior to the appointment of the "Creditor Trustee', as defined below, Movant was successful in formulating, negotiating and closing the Court approved sales representing the sale of all of the Debtors' real and tangible

3

personal property assets, and a key intangible personal property asset of Maywood. These
efforts have streamlined the tasks of the Creditor Trustee for the benefit of the creditors in these
Chapter 11 Cases. All of Movant's efforts combined throughout these Chapter 11 Cases, largely
focused on twelve (12) primary areas, all as more fully described below:

A. Matters throughout the Operational Period involving the multiple aspects peculiar to the
Debtors' businesses arising in the ordinary course of the Debtors' operations under the
Illinois Racing Act;

B. Matters involving many issues arising out of the requirements of operating a business as
complex as the Debtors' under the Code, including complying with all operational and
reporting requirements under the Code;

C. Efforts to market and solicit offers to purchase the Debtors' assets as going concerns
(individually, the **"Maywood Assets"** and **"Balmoral Assets"** and collectively, the
**"Debtors' Assets"**);

D. Matters involving the Court-approved bidding and sales procedures for the Debtors'
Assets, including multiple public auctions, and ultimately, the sale of Maywood's
"Commercial Lease", as defined below, for $850,000.00;

E. Matters involving the Court-approved bidding and sales procedures for the Debtors'
Assets, and ultimately, the sale of Maywood's "Oakbrook Terrace OTB Personalty", as
defined below, for $50,000.00;

F. Matters involving the Court-approved bidding and sales procedures for the Debtors'
Assets, including public auctions, and ultimately, the sale of Balmoral's "Crestwood
OTB Assets", as defined below, for $800,000.00;

G. Matters involving the Court-approved bidding and sales procedures for Maywood's
tangible personal property assets and at certain Maywood OTBs (collectively, the
**"Maywood Personalty"**), including public auctions, for $354,446.00;

H. Matters involving the Court-approved bidding and sales procedures for the Balmoral
Assets, including public auctions, and ultimately, the sale of Balmoral's 200+ acre racing

4

facility in Crete, Illinois (**"Balmoral Park"**) and tangible personal property assets located in and around Balmoral Park ( collectively, **"Balmoral Personalty"**) for $1,600,000.00 and additional non-cash consideration;

I.  Efforts to assist the Debtors in the formulation and negotiation of settlement discussions with the "Judgment Creditors", as defined below, who collectively upon the filing of these Chapter 11 Cases held a judgment against the Debtors in excess of $75 million, and which judgment directly caused the commencement of the Chapter 11 Cases, including assisting the Debtors with substantial massive discovery requests received from the Judgment Creditors under Bankruptcy Rule 2004. Each of the Debtors was served with thirty-seven (37) Requests for Production of Documents covering not only the Debtors and their multiple officers, directors, employees, and agents, but also twenty-eight (28) "related" entities and individuals;

J.  Efforts to assist the Debtors in the formulation, negotiation and preparation of the initial Joint Liquidating Plan (**"Plan"**) and related Disclosure Statement (**"Disclosure Statement"**), and subsequent formulation, negotiation and preparation of the Amended Joint Liquidating Plan (**"Amended Plan"**) and related Amended Disclosure Statement (**"Amended Disclosure Statement"**);

K.  Efforts to obtain the entry of court orders combining the hearings on the Amended Disclosure Statement and Amended Plan, and approving the adequacy of the Amended Disclosure Statement and confirmation of the Amended Plan; and

L.  Efforts to ready the Debtors' estates, including their respective books and records for turnover to the Creditor Trustee appointed pursuant to the confirmed Amended Plan (**"Creditor Trustee"**) on or about August 25, 2016.

Given the extensive commitment required of Movant throughout these Chapter 11 Cases, Movant has received court-authorized payments of interim compensation during the Chapter 11 Cases. On February 24, 2015, this Court entered that certain Order Establishing Procedures for the Payment of Interim Compensation and Reimbursement of Expenses of Professionals [Docket

No. 123] (**"Interim Compensation Order"**). Pursuant thereto, on April 17, 2015, Movant filed

its motion for the allowance of interim compensation and reimbursement of expenses as counsel

to the Debtors [Docket No. 154] (**"Interim Application"**) seeking interim compensation of

$435,279.00 (net of a provisional voluntary reduction for fee preparation time of $12,086.00)

and reimbursement of expenses in the amount of $6,902.72. After application of Movant's

prepayment balance as of the Petition Date[1], the Interim Application requested the remittance of

$146,655.50.  On May 1, 2015, the Court entered an order granting Movant's Interim

Application, and authorizing the Debtors' remittance of $146,655.50 in fees and $6,902.72 in

expense reimbursement to Movants [Docket No. 184], which sums the Debtors remitted to

Movant (collectively, the **"Interim Compensation Payment"**).

   Given the ongoing intensity of the Chapter 11 Cases and Movant's required time

commitment, on May 28, 2015, Movant filed the Debtors' motion to amend the Interim

Compensation Order [Docket No. 209] to be in the form of a typical monthly payment procedure

order, whereby the Debtors' professionals (Movant and "Special Counsel", as defined below)

could send their respective monthly invoices to the Debtors, counsel for the Office of the U.S.

Trustee in this District (**"UST"**), and counsel for the Judgment Creditors (**"Judgment

Creditors' Counsel"**). If no objections were received within the stated time, then the Debtors

were authorized to remit an interim compensation payment equal to 80% of the monthly fees

requested and a reimbursement of 100% of the monthly expenses incurred.  Said motion was

---

[1] Movant received a $200,000 prepayment from each of the Debtors, for a total prepayment of $400,000 prior to the commencement of these Chapter 11 Cases. Movant was initially contacted on December 9, 2014, immediately after the jury verdict announcement in the "District Court Litigation", as defined below, that day. Movant was given 2 weeks in which to: (i) understand the dynamics of these complicated situations; (ii) determine and review with the Debtors' management and principals the insolvency alternatives and the ramifications thereof; (iii) attempt to avoid the bankruptcy filings by, at Movant's suggestion, proposing a standstill agreement with the Judgment Creditors; (iv) prepare a proposed standstill agreement and attempt to negotiate same with counsel for the Judgment Creditors; (vi) prepare for the Chapter 11 filings; (vii) determine the necessary first-day motions and the immediate timing of critical motions that would have to be filed and heard within the next two weeks of the filings; (viii) coordinate same under the timing issue of the Christmas and New Year's holidays; (ix) prepare all filing documents and first day motions; (x) advise all necessary counsel of the upcoming bankruptcy filings; and (xi) file the Chapter 11 Cases. The massive effort involved to accomplish all of these matters under the severe pressure placed on the Debtors' management and principals, and resultant extreme time constraints placed on Movant resulted in 7 of Movant's 10 lawyers, and a contract attorney employed by Movant each having to expend extensive and emergency efforts on the various tasks assigned to each. As a result of the many exigencies and complexities, Movant expended approximately 288 hours of professional legal services from December 9, 2014 through December 24, 2014 consuming approximately $111,376.50 of said prepayments before the Chapter 11 Cases were filed, leaving a prepayment balance of $288,623.50 (**"Prepayment"**). Further details are available upon request.

granted by order of the Court dated June 10, 2015 [Docket No. 227] (**"Monthly Payment Procedures Order"**) and served to reduce the fees for preparation of interim compensation applications by such professionals which would have been incurred otherwise.

In accordance with the Monthly Payment Procedures Order, Movant has submitted sixteen (16) monthly requests as of the date hereof covering the months of April 2015 through July 2016, and received the monthly payments of interim compensation in the aggregate amount of $917,298.80, and reimbursement of expenses in the aggregate amount of $20,896.08, all as more fully set forth below (collectively, the **"Monthly Compensation Payments"**). Pursuant to the Monthly Payment Procedures Order, approximately $229,324.70 was held back and not paid with the Monthly Compensation Payments. In addition, Movant has incurred fees during the month of August 2016 of , for which no monthly statement has been submitted, and fees for the preparation of this Motion through September 30, 2016. In all, unpaid fees total

In total, as reflected herein, Movant has expended approximately **3,674.80 hours** of professional legal services during the period covered by this Motion (including the preparation of this Motion) and requests allowance and payment of final compensation in the amount of $1,658,794.50 for services rendered in these Chapter 11 Cases (before the voluntary reductions proposed herein) and reimbursement of ordinary and necessary expenses incurred in connection therewith in the amount of $28,280.53. After application of the Prepayment, Interim Compensation Payment, Monthly Compensation Payments, and the combined voluntary reduction in this Motion and the interim application totaling $33,011.28 (**"Voluntary Reduction"**)[2], the additional payments requested in excess of the above items previously paid are: (a) compensation in the amount of $273,205.42 for services rendered in these Chapter 11 Cases, including time for the preparation of this Motion, and (b) reimbursement of ordinary and necessary expenses incurred in connection therewith in the amount of $481.73.

---

[2] Movant applied a provisional $12,086.00 voluntary discount in the Interim Application. In this Motion, Movant is proposing an additional voluntary discount of $20,925.28, for a **total proposed voluntary discount of $33,011.28 representing in excess of a 12% discount of the payment sought herein in excess of all previously received payments**. In the event that any objections are filed to the relief sought in this Motion, Movant reserves the right to withdraw its offer of such proposed voluntary discount, and seek the allowance of the final compensation and reimbursement of expenses set forth in this Motion in full.

Movant submits that the efforts put forth and the results achieved to date amply support the allowance of the final compensation requested herein. Movant acted as consultant, negotiator, arbitrator, analyst, draftsman and legal advisor. Movant guided the Debtors through numerous issues that arose in these lengthy Chapter 11 Cases. Movant's efforts did not come easily. As more fully set forth below, Movant expended significant efforts throughout these Chapter 11 Cases and endeavored to maximize the value of all assets in these estates for the benefit of all creditors and other interested parties herein and minimize the expenses incurred in connection therewith. The distinctly adverse interests of many of the parties during these Chapter 11 Cases confronted Movant with continual, time-consuming and formidable challenges which Movant addressed professionally, efficiently and expeditiously.

## II.

## BACKGROUND, HISTORY OF THE DEBTORS AND PRESENT STATUS OF CASE

### A. BACKGROUND

The Debtors operated pari-mutuel wagering at their respective racetrack facilities (collectively the **"Tracks"**) under a license granted by the State of Illinois pursuant to the Illinois Horse Racing Act of 1975, 230 ILCS 5/1 et seq. (the **"Horse Racing Act"**).

The Illinois Racing Board (the **"IRB"**) was created in 1933 and its legal mandate is defined in the Horse Racing Act. The jurisdiction, supervision, powers, and duties of the IRB extended under the Horse Racing Act to the Debtors and every person who holds or conducts any race meeting within the State of Illinois where horse racing is permitted for any stake, purse or reward. As stated on its webpage (http://www.illinois.gov/irb), the mission of the IRB is to regulate horse racing through the enforcement of the Horse Racing Act and its rules and regulations, and to ensure the honesty and integrity of Illinois racing and wagering (*e.g.* issuing

licenses; establishing race schedules for all Illinois racetracks; collecting and distributing state taxes, Handle and the Purse).

Under the Horse Racing Act, race licensees such as the Debtors, who collect the bets and conduct harness horse races, split a portion of all bets with the horsemen, who own, train, and race the horses, among other things (collectively, the **"Horsemen"**). The Horsemen that raced at the Tracks were represented by the Illinois Harness Horsemen's Association (the **"IHHA"**), an Illinois not-for-profit association.

The total amount of all bets placed on a race is commonly referred to as the handle (the **"Handle"**). The portion of the bets allocated to the Horsemen is referred to as the purse (the **"Purse"**). Certain of the funds used to pay the Horsemen are maintained by a licensee in a segregated Purse account.

## B.  HISTORY OF THE DEBTORS

### 1.  Balmoral Park

Balmoral owned and ran its races at Balmoral Park which is about 20 minutes south of Chicago. For almost 90 years, Balmoral Park was the site of one of the most historic horse racing venues in the country. The original facilities, built in 1925, were known as "Lincoln Fields". In 1955, the Balmoral Jockey Club was organized, acquired Lincoln Fields and changed the name of the racetrack to "Balmoral Park". During its 90 year history, the racetrack conducted both thoroughbred and harness racing. From 1991 through 2015, Balmoral conducted only harness racing.

Balmoral Park has a one-mile track, equipped with lights for night racing. It was capable of seating approximately 10,000, and included stabling for over 1,000 horses. In addition to

hosting harness races, Balmoral offered various dining accommodations and special event facilities at the racetrack.

### 2.  Maywood Park

Maywood leased the land at Maywood Park which is located about 10 miles west of the Chicago Loop.  Maywood also subleased a portion of the leased property to a commercial development currently known as the "Harlem Irving Plaza".  For almost 83 years, Maywood Park was the site one of the most historic horse racing venues in the country.  Originally the home of the Cook County Fairgrounds, non-wagering harness racing began in 1932. The first racetrack was built on the site when Maywood Park was issued Illinois' first harness racing license in 1946. Maywood was the only Chicagoland racetrack solely devoted to harness racing. From 1946 through 2015, Maywood Park conducted standardbred harness races for 69 consecutive seasons, the longest in state history.

Maywood had a half-mile limestone racetrack, equipped with lights for night racing. It was capable of seating approximately 10,000, and included stabling for over 980 horses. In addition to hosting harness races, Maywood Park offered various dining accommodations and special event facilities.

### 3.  General Overview

Estimated combined annual revenues for 2014 for Balmoral and Maywood were approximately $23.3 million.  The Debtors' employees included members of various unions, office personnel, marketing and sales, outside maintenance, track crew, security, admission, inside maintenance, race office, emergency medical technicians, program sales, cameramen and pari-mutuel clerks.  The Debtors were the engine that drove thousands of additional jobs for people involved in Illinois horseracing.  For the year ending December 31, 2014, Balmoral and

Maywood collectively ran approximately 2,195 races involving some 2,000 different horses and thousands of Horsemen.

### 4.   **Pari-Mutuel Wagering at Racetracks and OTBs**

The Debtors' primary revenues came from pari-mutuel wagering on the races run at the Tracks and the off-track betting system at the Debtors' OTBs. Pari-mutuel wagering is where the track – other than ensuring the integrity of the race – has no interest in which horses win or lose, but only acts as an agent. The track holds the money wagered until the finish of the race and pays the winning ticket holders the proper amount of the tickets determined by the type of wagers selected by the customer.  Pari-mutuel wagering became legal in Illinois on July 1, 1926.

Today, pari-mutuel wagering in Illinois can be made on site at the track for races run at that track or by "simulcast," which is via closed circuit television at the track for races run at other tracks located throughout the country. In Illinois, simulcasts are also conducted at OTB locations in the Chicago metropolitan area and elsewhere (there are 27 in total).  Balmoral owned and operated three (3) OTBs and Maywood owned six (6), all of which were operated by a separate, but affiliated, company, Coast to Coast Food Service, Inc., an Illinois corporation that also handled food service at both of the Tracks (**"Coast To Coast"**).  Illinois became the first state to permit race tracks to own and operate an OTB. Balmoral opened up Illinois' first OTB in Peoria in 1987.  In addition, Balmoral and Maywood's simulcast "signal" broadcasted races to approximately 3,000 separate locations worldwide.

Illinois' OTBs are, or were in the case of the Debtors, each owned by one of the five (5) Illinois horse racing licensees (collectively, the **"Illinois Tracks"**), or their affiliates: (a) Balmoral; (b) Maywood; (c) Arlington International Racecourse, LLC located in Arlington Heights, Illinois (**"Arlington"**); (d) Hawthorne Race Course, Inc., located in Stickney, Illinois

("**Hawthorne**"); and (e) Fairmount Park, Inc. located in downstate Collinsville, Illinois. Out of all these venues, only the Debtors ran harness racing, each having different length tracks. The other three Illinois Tracks run thoroughbred racing[3].

Unlike thoroughbred racing which is run only during spring, summer and fall in Illinois, harness racing at Balmoral and Maywood was operated year round. Since 1998, the Debtors operated a coordinated racing schedule approved by the IRB and for the benefit of the Horsemen.

### 5. Events Leading to the Chapter 11 Filing

Chicagoans have enjoyed horse racing since the early 1830s, and by the 1930s had more horse racing tracks than any other metropolitan area in the United States.

Section 1.2 of the Horse Racing Act states that the legislative intent is to "benefit the people of the State of Illinois by assisting economic development and promoting Illinois tourism."

Despite all of the benefit brought about by the horse racing industry, since 1992 (the first full year of riverboat casino operations in Illinois), the proliferation of riverboat gambling casinos, video lottery terminals and "**Racinos**" (racetracks that also have casino-style non-racing gaming on site, such as slot machines) in most other states had seriously impaired the ability of Maywood, Balmoral and all of the other Illinois Tracks to operate profitably.

To offset the declining revenues in the Illinois horse racing industry, the Illinois Tracks sought for over 25 years, and Arlington, Hawthorne and Fairmount Park continue to seek, to have slot machines permitted at their respective racetracks. The Illinois Tracks believed the additional revenues the slots would generate would allow each of them to operate profitably. To date, efforts to obtain legislation allowing slots at the Illinois Tracks have been unsuccessful,

---

[3] Beginning January 1, 2016, Hawthorne also runs harness racing in addition to its thoroughbred racing.

however, these efforts continue unabated.  Currently there are approximately 45 tracks located in 14 states (other than Illinois) that have additional forms of casino-style gambling available.

In the absence of legislation authorizing casino-style gaming, to protect the horseracing industry and maintain and grow the economic benefit derived from Illinois horse racing, in 2006, Illinois passed a law (the **"2006 Racing Act"**) imposing a 3% tax on the four largest riverboat casinos in Illinois: (a) Empress Casino Joliet Corporation, (b) Des Plaines Development Limited Partnership, d/b/a Harrah's Joliet Casino Hotel, (c) Hollywood Casino-Aurora, Inc., and (d) Elgin Riverboat Resort Riverboat Casino, d/b/a Grand Victoria Casino (collectively, the **"Judgment Creditors"**). In 2008, the 2006 Racing Act was extended for an additional three (3) years (the **"2008 Racing Act"**).  The possibility of 2015 and beyond legislative relief in whatever form for the horse racing industry in Illinois remained a critical issue in the Chapter 11 Cases.

Part of the legislative findings contained in the 2006 and 2008 Racing Acts concluded that riverboat operations in Illinois negatively impacted the State of Illinois' horse racing industry, a sector employing over 37,000 Illinoisans, in a direct and profound manner, and as a result, the State of Illinois' breeding industry, agriculture and other businesses also suffered.

On May 30, 2006, the Judgment Creditors filed a complaint in the Circuit Court of Will County, in the case styled *Empress Casino Joliet Corp., et al. v. Giannoulias*, No. 06 CH 1294, challenging the constitutionality of the 2006 Racing Act. Maywood and Balmoral intervened to defend the legislation, and argued their motion to dismiss the Judgment Creditors' complaint before both the Circuit Court and the Illinois Supreme Court.

On June 5, 2008, the Illinois Supreme Court unanimously affirmed the constitutionality of the 2006 Racing Act on all bases, and dismissed the Judgment Creditors' complaint.

Following the passage and enactment of the 2008 Racing Act, the Judgment Creditors again immediately filed a lawsuit in the Circuit Court of Will County challenging the constitutionality of the 2008 Racing Act.  The Circuit Court of Will County rejected that argument, finding it foreclosed by the Illinois Supreme Court's ruling on the 2006 Racing Act. The Third District unanimously affirmed that ruling on appeal and in May 2011, the Illinois Supreme Court denied the Judgment Creditors' petition for leave to appeal, effectively terminating their constitutional challenge to the 2008 Act. The U.S. Supreme Court denied the Judgment Creditors' petition for *certiorari* from the Illinois Supreme Court's unanimous decision on June 8, 2009.

Subsequently in 2009, the Judgment Creditors filed another suit, this one in the U.S. District Court for the Northern District of Illinois, Eastern Division (**"District Court"**), as Case No. 09-CV-03585, against Balmoral, Maywood, Arlington, Hawthorne and John Johnston (**"John"**)[4], among others, alleging various theories of recovery, including an alleged scheme involving former Governor Rod Blagojevich and the 2008 Racing Act, notwithstanding that the 2006 Racing Act had been upheld by the Illinois Supreme Court (the **"District Court Litigation"**).

In August 2013, the District Court granted the Debtors' and John's motion for summary judgment, concluding that the Judgment Creditors had failed to offer sufficient evidence that the defendants' actions proximately caused the Judgment Creditors' alleged harm and completely terminated the case in favor of the defendants.  The Judgment Creditors appealed that decision and on August 14, 2014, the United States Court of Appeals for the Seventh Circuit affirmed in part, and reversed in part, the District Court's ruling. The Seventh Circuit held there was no

---

[4] John is a shareholder and member of the board of directors of World Wide Wagering, Inc., the 100% owner of the issued and outstanding common stock in and to the Debtors (**"World Wide"**). John is also a member of the Debtors' boards of directors, the President of Balmoral and the Vice-President of Maywood.

showing of proximate damage or wrongdoing with respect to the 2006 Racing Act.  With respect
to the 2008 Racing Act, however, the Seventh Circuit held that there was a dispute of fact as to
whether defendants promised to pay Blagojevich a bribe to sign the 2008 Racing Act into law.
The Seventh Circuit held further that if such evidence were accepted, this would be sufficient to
establish that the racetracks proximately caused the Judgment Creditors' alleged harm.  The
Seventh Circuit thus vacated the District Court's ruling as to the 2008 Racing Act, and remanded
the case back for further proceedings.

After a week-long jury trial, on December 9, 2014 a jury verdict was announced, and on
December 11, 2014 the actual judgment order was entered, in favor of the Judgment Creditors
against Balmoral, Maywood and John, jointly and severally, in excess of $75 million
(**"Judgment"**). Balmoral, Maywood, and John collectively contested the Judgment, filed a post-
judgment motion (which was denied), and subsequently filed an appeal to the U.S. Court of
Appeals for the Seventh Circuit (the **"Appeal"**)[5].

Under Rule 62 of the Federal Rules of Civil Procedure, the Judgment Creditors were
prohibited from exercising any of their post-judgment collection remedies against Balmoral,
Maywood and John for 14 days from and after the entry of the Judgment. Such 14-day period
would have expired on December 25, 2014.

At Movant's recommendation and with Movant's assistance, Balmoral, Maywood, and
John and his insolvency counsel attempted to obtain a consensual standstill period before the
expiration of the 14-day stay with the Judgment Creditors to allow for settlement negotiations.
Movant prepared a proposed standstill agreement, however further efforts proved

---

[5] On August 2, 2016, the U.S. Court of Appeals for the Seventh Circuit issued its ruling in the Appeal reversing the District Court's ruling as to the RICO counts, but affirming the District Court's ruling on all state law damages. The matter was remanded to the District Court for the entry of a modified judgment awarding the Judgment Creditors damages in the amount of $25,940,000.00. This still represents over 70% of the outstanding unsecured claims in the Chapter 11 Cases.

unsuccessful.  Neither John nor the Debtors had the economic wherewithal to post the necessary

bond pending any Appeal to forestall collection efforts.

In response thereto, on December 23, 2014, John voluntarily filed an individual Chapter

11 Case in this District, Case No. 14-45657 (**"Johnston Chapter 11 Case"**).

On December 24, 2014, the Debtors commenced these Chapter 11 Cases to stay the

Judgment and in order to protect the value of their assets and businesses for the benefit of all

of their creditors, employees, and other interested parties.

### C.      DEBTOR IN POSSESSION

Throughout the almost 2 years of these Chapter 11 Cases, due in large part to the manner

in which Movant has conducted the Chapter 11 Cases and led and advised the Debtors'

management, the Chapter 11 Cases proceeded almost entirely by agreement with all parties,

including the UST, the IRB, the Illinois Attorney General's Office, the IHHA, the Judgment

Creditors, and numerous other creditors and interested parties.  These results reflected Movant's

constant efforts to have consistent communication with all other counsel, creditors and interested

parties to ensure the Chapter 11 Cases proceeded as efficiently and as effectively as possible

under the circumstances.

### D.      ADMINISTRATION OF CASE

During these Chapter 11 Cases, Movant took steps to: (i) investigate the acts, conduct,

assets, liabilities and financial condition of the Debtors; (ii) advise the Debtors of their rights,

duties and obligations as debtors in possession under the Code; (iii) perform such duties as were

necessary to maintain the viability of the Debtors within the confines of Chapter 11; (iv) assist in

the Debtors' dealings with their creditors (including, without limitation, the Judgment Creditors),

the UST, the IRB, the IHHA, other federal, state and local governmental agencies, employees,

suppliers and customers; (v) analyze the various means of concluding these Chapter 11 Cases; and (vi) perform such other duties as were in the best interests of these estates.

The vast majority of the time expended in these Chapter 11 Cases was rendered by Chad H. Gettleman and Nathan Q. Rugg.  The complexities of these Chapter 11 Cases required the time and attention of Messrs. Gettleman and Rugg, often to the almost total preclusion of other matters.  The efforts required and expended by members of Movant herein amply supports the allowance of final compensation requested herein.

## III.

## LEGAL SERVICES RENDERED

For ease of reference, Movant has identified and set forth seven (7) categories of legal services.  Each category contains a narrative of the matters involved; a general description of the tasks performed; detailed time records in chronological order, with each attorney's time described therein, and the nature and purpose of such entries; and the result achieved or benefit to the estates, as required by In re Wildman, 72 B.R. 700 (Bankr. N.D. Ill. 1987); In re Pettibone Corporation, 74 B.R. 293 (Bankr. N.D. Ill. 1987); and Matter of Continental Illinois Securities Litigation, 962 F.2d 566 (7th Cir. 1992).

| DESCRIPTION | TOTAL HOURS | TIME VALUE |
|---|---|---|
| A.  Administrative Matters | 952.30 | $ 402,592.50 |
| B.  Illinois Racing Board Matters | 269.20 | $ 120,772.00 |
| C.  Executory Contract Issues | 234.60 | $  99,166.50 |
| D.  Riverboat Casinos' Issues And Settlement Efforts | 834.90 | $ 389,152.00 |
| E.  Asset Sale Efforts | 810.70 | $ 378,717.00 |
| F.  Plan of Reorganization | 360.90 | $ 162,443.50 |
| G.  Fee Petition Preparation** | 212.20 | $ 105,951.00 |
| **TOTAL** | **3,674.80** | **$1,658,794.50** |

**\*\*Movant has proposed a voluntary discount to its fees sought in connection with the fee petition preparation category, as reflected in Section III(G) below.**

-------------------------------------------------------------------------------------------------------------

 For ease of review, the Statements of Services rendered per category are attached as Group Exhibits A - G, respectively. Each Group Exhibit contains separate tabs for the periods of time represented by the Interim Application and each month thereafter (collectively, the **"Monthly Statements"**) for each category. Not every category had services rendered during each month of the Chapter 11 Cases.

 A summary by category for time spent by Movant as reflected in the Interim Application and each Monthly Statement follows. A review of these summaries shows the ebb and flow of Movant's efforts during the Chapter 11 Cases.  As is customary, services for "Administrative Matters" were mostly rendered during the first 12 months of these 21 month Chapter 11 Cases. Services for "Illinois Racing Board Matters" were largely throughout the Operational Period. Services for "Executory Contract Issues" varied throughout the Chapter 11 Cases as various deadlines approached and settlement negotiations ensued. Movant's services involving the Judgment Creditors, as holders of the vast majority of unsecured claims, largely occurred early in the Chapter 11 Cases, but continued in lesser, but still significant, amounts through the rest of the Operational Period. Services for "Asset Sales Efforts" did not begin in earnest until the retention of a professional investment banking firm to handle the marketing effort for the Debtors' Assets. Services for the "Plan of Reorganization" did not begin until just before the end of the Operational Period. And services for "Fee Petition Preparation" were largely focused at the times the Interim Application and this Motion were being prepared and filed.

 The total of all services, by month and category, rendered during the Chapter 11 Cases broken down by the Interim Application period and each of the Monthly Statements is summarized as follows:

## CHAPTER 11 SERVICES
### (December 24, 2014 - August 25, 2016)

| DESCRIPTION | TOTAL HOURS | TIME VALUE |
|---|---|---|

### A. ADMINISTRATIVE MATTERS

| Description | Total Hours | Time Value |
|---|---|---|
| December 24, 2014 - March 31, 2015 | 490.40 | $214,564.50 |
| April 2015 | 41.50 | $15,913.00 |
| May 2015 | 44.30 | $17,793.50 |
| June 2015 | 41.50 | $17,666.50 |
| July 2016 | 41.00 | $18,533.00 |
| August 2015 | 110.70 | $44,050.50 |
| September 2015 | 22.90 | $9,567.50 |
| October 2015 | 27.70 | $10,627.50 |
| November 2015 | 39.30 | $14,915.50 |
| December 2015 | 32.30 | $11,868.50 |
| January 2016 | 23.70 | $10,852.50 |
| February 2016 | 5.40 | $2,413.00 |
| March 2016 | 6.50 | $2,854.50 |
| April 2016 | 4.50 | $1,957.50 |
| May 2016 | 5.20 | $2,280.00 |
| June 2016 | 3.50 | $1,531.50 |
| July 2016 | 8.30 | $3,619.50 |
| August 2016 | 3.60 | $1,584.00 |
| **TOTAL CATEGORY A** | **952.30** | **$402,592.50** |

### B. ILLINOIS RACING BOARD MATTERS

| Description | Total Hours | Time Value |
|---|---|---|
| December 24, 2014 - March 31, 2015 | 103.30 | $44,138.50 |
| April 2015 | 29.40 | $13,473.00 |
| May 2015 | 5.40 | $2,367.00 |
| June 2015 | 9.20 | $4,434.00 |
| July 2016 | 1.30 | $610.50 |
| August 2015 | 28.50 | $13,551.50 |
| September 2015 | 63.10 | $28,862.50 |
| October 2015 | 3.30 | $1,570.50 |
| November 2015 | 3.50 | $1,828.50 |
| December 2015 | 9.40 | $4,089.00 |

| | | |
|---|---|---|
| January 2016 | 8.70 | $4,000.50 |
| February 2016 | 0.10 | $43.50 |
| March 2016 | 2.50 | $1,096.50 |
| April 2016 | 0.00 | $0.00 |
| May 2016 | 0.00 | $0.00 |
| June 2016 | 1.10 | $532.50 |
| July 2016 | 0.40 | $174.00 |
| August 2016 | 0.00 | $0.00 |
| **TOTAL CATEGORY B** | **269.20** | **$120,772.00** |

### C.  EXECUTORY CONTRACT ISSUES

| **Description** | **Total Hours** | **Time Value** |
|---|---|---|
| December 24, 2014 - March 31, 2015 | 76.40 | $30,953.50 |
| April 2015 | 27.90 | $11,217.50 |
| May 2015 | 1.90 | $844.50 |
| June 2015 | 7.40 | $3,579.00 |
| July 2016 | 21.00 | $8,819.00 |
| August 2015 | 19.90 | $8,260.50 |
| September 2015 | 15.80 | $7,298.00 |
| October 2015 | 14.00 | $6,441.00 |
| November 2015 | 0.20 | $105.00 |
| December 2015 | 4.60 | $2,019.00 |
| January 2016 | 3.00 | $1,332.00 |
| February 2016 | 7.70 | $3,475.50 |
| March 2016 | 4.50 | $1,957.50 |
| April 2016 | 3.40 | $1,479.00 |
| May 2016 | 5.60 | $2,436.00 |
| June 2016 | 19.60 | $8,210.00 |
| July 2016 | 0.80 | $348.00 |
| August 2016 | 0.90 | $391.50 |
| **TOTAL CATEGORY C** | **234.60** | **$99,166.50** |

### D.  RIVERBOAT CASINOS' ISSUES AND SETTLEMENT EFFORTS

| **Description** | **Total Hours** | **Time Value** |
|---|---|---|
| December 24, 2014 - March 31, 2015 | 260.80 | $118,100.00 |
| April 2015 | 105.30 | $51,331.50 |
| May 2015 | 104.80 | $49,138.00 |

| | | |
|---|---|---|
| June 2015 | 82.00 | $36,022.50 |
| July 2016 | 56.10 | $27,097.50 |
| August 2015 | 35.70 | $17,589.50 |
| September 2015 | 20.00 | $9,978.00 |
| October 2015 | 37.40 | $18,114.00 |
| November 2015 | 33.90 | $14,834.50 |
| December 2015 | 37.40 | $18,447.00 |
| January 2016 | 37.90 | $18,417.50 |
| February 2016 | 23.50 | $10,038.50 |
| March 2016 | 0.10 | $43.50 |
| April 2016 | 0.00 | $0.00 |
| May 2016 | 0.00 | $0.00 |
| June 2016 | 0.00 | $0.00 |
| July 2016 | 0.00 | $0.00 |
| August 2016 | 0.00 | $0.00 |
| **TOTAL CATEGORY D** | **834.90** | **$389,152.00** |

E.    **ASSET SALE EFFORTS**

| **Description** | **Total Hours** | **Time Value** |
|---|---|---|
| December 24, 2014 - | | |
| March 31, 2015 | 5.20 | $2,694.00 |
| April 2015 | 1.20 | $612.00 |
| May 2015 | 0.00 | $0.00 |
| June 2015 | 1.10 | $505.50 |
| July 2016 | 37.20 | $17,019.00 |
| August 2015 | 37.10 | $18,810.00 |
| September 2015 | 43.70 | $20,779.50 |
| October 2015 | 42.20 | $20,544.00 |
| November 2015 | 57.60 | $26,561.00 |
| December 2015 | 178.30 | $83,274.50 |
| January 2016 | 78.60 | $37,274.00 |
| February 2016 | 50.10 | $23,336.50 |
| March 2016 | 66.70 | $32,285.50 |
| April 2016 | 117.40 | $53,307.00 |
| May 2016 | 86.50 | $38,312.50 |
| June 2016 | 7.40 | $3,228.00 |
| July 2016 | 0.40 | $174.00 |
| August 2016 | 0.00 | $0.00 |
| **TOTAL CATEGORY E** | **810.70** | **$378,717.00** |

**F.    PLAN OF REORGANIZATION**

| Description | Total Hours | Time Value |
|---|---|---|
| December 24, 2014 - | | |
|     March 31, 2015 | 7.20 | $3,451.00 |
| April 2015 | 6.70 | $2,787.50 |
| May 2015 | 0.00 | $0.00 |
| June 2015 | 2.00 | $879.00 |
| July 2016 | 0.00 | $0.00 |
| August 2015 | 3.00 | $1,310.00 |
| September 2015 | 0.00 | $0.00 |
| October 2015 | 7.30 | $3,328.50 |
| November 2015 | 11.90 | $4,208.50 |
| December 2015 | 20.10 | $10,059.50 |
| January 2016 | 25.20 | $11,961.00 |
| February 2016 | 3.00 | $1,485.00 |
| March 2016 | 116.80 | $50,413.00 |
| April 2016 | 38.70 | $18,083.50 |
| May 2016 | 32.70 | $13,637.50 |
| June 2016 | 22.60 | $9,910.00 |
| July 2016 | 29.10 | $13,853.50 |
| August 2016 | <u>34.60</u> | <u>$17,076.00</u> |
| **TOTAL CATEGORY F** | **360.90** | **$162,443.50** |

**G.    FEE PETITION PREPARATION (through September 30, 2016)**

| Description | Total Hours | Time Value |
|---|---|---|
| January 2014 - | | |
|     April 2015 | 66.50 | $33,463.50 |
| May 2015 | 0.00 | $0.00 |
| June 2015 | 8.40 | $4,284.00 |
| July 2016 | 0.40 | $210.00 |
| August 2015 | 3.00 | $1,548.00 |
| September 2015 | 2.90 | $1,522.50 |
| October 2015 | 1.60 | $831.00 |
| November 2015 | 1.30 | $565.50 |
| December 2015 | 1.10 | $478.50 |
| January 2016 | 4.30 | $2,257.50 |
| February 2016 | 2.20 | $957.00 |
| March 2016 | 1.10 | $478.50 |
| April 2016 | 1.30 | $565.50 |
| May 2016 | 13.10 | $6,778.50 |
| June 2016 | 8.90 | $4,591.50 |

| | | |
|---|---|---|
| July 2016 | 3.20 | $1,635.00 |
| August 2016 | 0.00 | $0.00 |
| September 2016 | 92.90 | $45,784.50 |
| **TOTAL CATEGORY G*** | **212.20** | **$105,951.00** |
| **TOTAL ALL CATEGORIES*** | **3,674.80** | **$1,658,794.50** |

**\*Fee petition preparation to be voluntarily reduced as reflected in Section III(G) below.**

-------------------------------------------------------------------------------------------------------------

## A. ADMINISTRATIVE MATTERS

**SERVICES RENDERED**

| ATTORNEY | HOURS | RATE | VALUE |
|---|---|---|---|
| AFB | 203.80 | $325.00 /hr | $66,235.00 |
| HLA | 1.10 | $525.00 /hr | $577.50 |
| BAB | 0.10 | $465.00 /hr | $46.50 |
| ESB | 63.30 | $395.00 /hr | $25,003.50 |
| SBC | 5.80 | $395.00 /hr | $2,291.00 |
| NRD | 25.60 | $150.00 /hr | $3,840.00 |
| CHG | 200.60 | $525.00 /hr | $105,315.00 |
| HBM | 29.60 | $525.00 /hr | $15,540.00 |
| NQR | 422.40 | $435.00 /hr | $183,744.00 |
| **TOTAL** | **952.30** | | **$402,592.50** |

Movant expended approximately 952.30 hours (see Group Exhibits A(1) - A(18) attached hereto) during these Chapter 11 Cases in connection with Debtors' performance of the debtor in possession duties under Section 1107 of the Code and the numerous administrative and related matters arising therein. These matters included the many miscellaneous services that are usually required to be furnished on behalf of a debtor in Chapter 11 as well as many other matters that arose due to the complexity of the Debtors' affairs.

Among others detailed in Movant's time entries, the many efforts rendered by Movant in this category include:

i. Taking steps to initiate the investigation of the acts, conduct, assets, liabilities and financial condition of the Debtors;

ii. The review and analysis of the appropriate means for the continued usage by the Debtors of their approximately 26 prepetition bank accounts at their depository bank, FirstMerit Bank (**"Bank"**).  Due to difficulties created by the Bank, immediately after the commencement of the Chapter 11 Cases, and continuing almost daily thereafter, Movant had to address numerous matters the Bank has raised to allow the Debtors to have continued usage of their numerous bank accounts in the ordinary course of their businesses (see also Paragraph 1 below);

iii. The timely and immediate treatment of prepetition priority wage claims for the many employees of the Debtors to ensure the uninterrupted operation of the Debtors' businesses (see also Paragraph 2 below);

iv. The review and analysis of numerous Uniform Commercial Code, federal and state tax lien, and judgment lien searches, which Movant ordered from the Illinois Secretary of State's Office for Maywood, and from the Ohio Secretary of State's Office for Balmoral in order to ascertain the existence of any parties holding secured claims against any of the Debtors' respective assets;

v. The prompt responses to the inquiries which came from creditors and other parties in these Chapter 11 Cases questioning the causes for the Chapter 11 filings, the impact on and filing of their claims, the continuation of the Debtors' businesses, and many other matters. Movant has always believed that a key component of any Chapter 11 case is to foster a more expeditious and cost-effective process, by among other things, promptly responding to inquiries from creditors and other parties in the case. Here, Movant fielded calls from parties who had significant business dealings with the Debtors, including the IHHA, in-state and out-of-state tracks, advance wagering locations, and other parties to simulcast wagering agreements with the Debtors;

vi. Issues concerning management compensation and role of persons in the Debtors' management team, critical to the day-to-day Chapter 11 and operational responsibilities and the long term success of the Chapter 11 Cases.  Movant helped the Debtors identify key management and obtained Court approval for the retention bonus program the Debtors believed necessary to retain the two critical non-insider employees throughout the Chapter 11 Cases (see also Paragraph 3 below);

vii. The continuation of the Debtors' various customer programs and services critical to the continued maintenance of the Debtors' businesses (see also Paragraph 4 below);

24

viii. The continuation of necessary utility services under 26 separate accounts  maintained by the Debtors which permitted both Debtors' operations to continue uninterrupted (see also Paragraph 5 below);

ix. The timely preparation and filing of the extensive and highly detailed Bankruptcy Schedules, Statement of Affairs, Statement of Executory Contracts, Statement of Equity Security Holders, and Rule 2015.3 Reports. To accurately reflect the complexities of the Debtors' businesses required Movant's review of a multitude of records and documents, and the preparation of the motion seeking the necessary extension of time required to complete this sizeable task properly (see also Paragraph 6 below);

x. The continuation of Illinois Lottery services at the Tracks, which also enhanced revenues and attendance (see also Paragraph 7 below);

xi. The timely filing and dissemination of the debtor-in-possession operating reports and other financial statements as well as the necessary assistance to the Debtors as required regarding same. Movant also reviewed with the Debtors' representatives the UST's Operating Instructions for all Chapter 11 debtors to provide for the requisite understanding of the Chapter 11 requirements (see also Paragraph 8 below);

xii. The retention of, and assistance to, Foley & Lardner LLP (**"Special Counsel"**), special counsel to the Debtors in connection with the ongoing post-trial litigation efforts in the District Court Litigation and IRB matters (see also Category D below[6]);

xiii. The preparation for and attendance at the combined initial debtor's interview at the UST's office, and later combined first meeting of creditors, and follow-up meeting with all interested parties to continue to fully review the status of the Chapter 11 Cases and the Debtors' intended approach to their reorganization efforts;

xiv. The rendering of timely responses to the inquiries of the UST throughout these Chapter 11 Cases. Movant contacted the attorney from the UST's office assigned to the Chapter 11 Cases in connection with most motions in the Chapter 11 Cases to discuss the Debtors' intentions related thereto. Movant provided the UST with updates on all matters arising in the Chapter 11 Cases and often sought input from the UST on same;

xv. The review and analysis of legal title to Balmoral Park and Balmoral's real estate parcel in Crestwood, Illinois where the Crestwood OTB was operated (**"Crestwood**

---

[6] Movant has separated services rendered in connection with the retention of Special Counsel between Category A, Administrative Matters, and Category D, Riverboat Casinos' Issues and Settlement Efforts. All of Movant's customary services concerning special counsel retention are included in Category A. Movant's services rendered directly in response to certain of the Judgment Creditors' objections are included in Category D. Those regarding the IRB are in Category B.

**Property"**), including the ordering and examination of new title commitments for both real properties;

xvi. The filing of the necessary pleading to have the Chapter 11 Cases jointly administered in order to minimize administrative expenses, and to assist the Debtors' efforts to maintain appropriate record keeping as debtors in possession;

xvii. The analysis of the applicability and advisability of the potential substantive consolidation of the Chapter 11 Cases. As there was substantial commonality between the Debtors' management, operations, assets and liabilities, Movant examined the propriety and benefits, if any, that a substantive consolidation might bring to the Debtors' estates and creditors, to preliminarily determine the possible administrative efficiencies and economic advantages of such a consolidation. This was ultimately incorporated into the Amended Plan, as more fully described in Category F below;

xviii. The proposed retention of Crane and Norcross, as special counsel to the Debtors in connection with real estate tax issues in Melrose Park which the law firm had been providing under a three-year retention agreement. Movant was asked by the Debtors to analyze if such retention agreement could be rejected as an executory contract, and the law firm still retained on a go-forward basis. Movant rendered substantial services in this regard, however prior to any court action, Movant was instructed to table this matter given other more pressing matters (see also Category C below[7]);

xix. Formulation and preparation of the motion and related entry of the Monthly Payment Procedures Order;

xx. Services related to addressing continuing insurance coverage related to the property of the estates and to respond to inquiries from certain carriers related to such coverage and the impact of the filing of the Chapter 11 Cases;

xxi. Analysis of segregated funds (see also Paragraph 9 below); and

xxii. Numerous other miscellaneous tasks required for the Debtors' operations and compliance with their duties and obligations as debtors in possession throughout these Chapter 11 Cases, and to determine alternative means of successfully concluding these Chapter 11 Cases.

---

[7] Movant has separated services rendered concerning Crane and Norcross between Category A, Administrative Matters, for Movant's customary services regarding special counsel retention, and Category C, Executory Contract Issues, for services rendered regarding the possible rejection of the prepetition retention agreement.

In addition to the areas of administrative services performed by Movant and generally outlined above, the major concentration of administrative services performed by Movant during these Chapter 11 Cases may be summarized as follows:

1.    **Cash Management Motion and Related Bank Negotiations**.

The critical continued usage of the Debtors' twenty-six (26) different accounts ("**Accounts**") at the Bank proved to be an unexpected, frustrating, and extremely time-consuming complication in the Chapter 11 Cases. In Movant's considerable experience in Chapter 11 cases, it has never seen nearly as many problems with a depository bank as the Debtors had with the Bank both prior to the Petition Date and largely throughout the Operational Period.

Because of the Bank's own perceived exposure arising from the Judgment, the Bank initially refused to let the Accounts be used in the ordinary course of the Debtors' businesses. After the Petition Date, the Bank placed an administrative freeze on the Accounts, dishonored certain prepetition electronic payments and transfers, including critical payroll payments to employee and certain tax authorities that had cleared prior to the Petition Date, attempted to restrict certain usage of the Accounts, and recover fees it paid to its counsel. To provide the Debtors with as seamless a transition into the Chapter 11 Cases from an operational standpoint, and continuing throughout these Chapter 11 Cases, Movant was constantly required to work to allow some semblance of normalcy for the Debtors' use of the Accounts. The Bank's actions threatened the reorganization efforts from the outset and required often emergency daily and weekly efforts by Movant to resolve the situation.

Matters became so problematic that Movant was required to analyze and research whether the Bank was violating the automatic stay provisions by its actions. Ultimately Movant

was able to have the Bank's administrative freeze lifted and successfully negotiate a resolution to

the Bank's demand for various atypical provisions and protections in the Debtors' proposed cash

management order.  Movant prepared and filed a motion to modify the UST operating guidelines

[Docket No. 10] for the Debtors to maintain existing bank accounts, cash management system

and forms. Movant obtained an agreed order [Docket No. 46] (the "**Cash Management**

**Order**"), following time-consuming negotiations with the Bank, which objected to many of the

standard requests Movant included in the draft form of order prior to and after filing.

After the entry of the Cash Management Order, Movant was nonetheless required to

continue to address lingering issues raised by the Bank related to the post-petition Accounts

access and use, and limitations the Bank extended to separate affiliated entities which the

Debtors needed to operate.  Such problems continued five to six months into the Chapter 11

Cases.  For example, in March 2015, notwithstanding the agreed Cash Management Order

entered two months earlier, increased Bank fees, and other accommodations by the Debtors, the

Bank then informed the Debtors that it was seeking to terminate the banking relationship with

the Debtors in the upcoming months. Further in late May 2015, certain Accounts used by the

Debtors for credit card processing were inexplicably shut down by the Bank. Regardless of the

potential stay violation created by sending termination letters directly to the Debtors, the Bank's

action required Movant to help the Debtors determine how they might transition critical bank

accounts to a new depository institution, while researching the legal remedies available to ensure

that the Bank provided customary and necessary continued services post-petition.

The issues got worse when the Bank formally notified Debtors of its intent to terminate

the usage of the Accounts, and increased attention and action by Movant became critical to

preserve the Debtors' ability to maintain their business operations, which involved continual

processing of millions of dollars in cash and financial transactions in any given month. While

Movant researched and advised of the legal remedies available to Debtors to challenge the

termination, the Debtors ultimately concluded that moving all of their bank accounts and funds

on deposit from Bank to a new depository institution was in the best interests of their estates.

Movants worked with the Debtors as they engaged in a long process of interviewing potential

replacement banks, and eventually developed a relationship with Associated Bank, N.A.

("**Associated**").  Associated Bank set up and made available to the Debtors new bank accounts

with new account numbers so that the Debtors could transfer funds from the Bank Accounts

immediately upon obtaining court approval to do so.

The Movant thus drafted and filed on May 28, 2015, the appropriate motion to authorize

the transfer and to amend the Cash Management Order accordingly [Docket No. 210].  In

addition to addressing the legal issues relevant to the motion, Movant also worked closely with

Debtors to understand and address the requirements of Associated, the process for and timing of

the Accounts transition, which Accounts would be transitioned and which could be terminated,

and the contingencies at issue for the transition. For example, Movant and Debtors determined

that they could streamline their cash management system and save future bank fees by

eliminating seven (7) of the twenty-six (26) Accounts, which would not be replaced by

corresponding Associated accounts.

Unfortunately, after filing the needed motion and despite assurances received from

Associated that all internal requirements for the transition had been satisfied (and the fact that

new accounts were in fact set up), Associated subsequently declined to proceed with the

transition and ultimately the Debtors were unable to move the Accounts. Accordingly, after

presenting the Associated motion on June 2 and June 9, 2015, Movant withdrew the motion at

the final hearing on the matter on June 16, 2015. Two weeks later, the Bank filed a motion to

modify the automatic stay to terminate the Accounts [Docket No. 235] (the "**Bank Stay**

**Motion**"), once again bringing the disputes with the Bank to a head. If the Court had granted the

Bank Stay Motion, the Debtors' operations would have had to cease immediately due to their

inability to process their accounts receivables and payables, and the numerous banking

transactions they conducted on a daily basis.  Such a result would have been nothing short of a

disaster for the Debtors and their creditors.  Movant was thus forced to put significant time and

effort into both combatting the Bank Stay Motion, but also assisting the Debtors to find some

viable remedy outside of court, whether it was a negotiated deal with the Bank or finding a new

depository institution.

Due to the importance of this matter Movant researched and drafted a substantive

objection [Docket No. 245] and filed it in advance of the initial presentation of the Bank Stay

Motion.  Movant determined that taken on its face, the Bank Stay Motion failed to establish even

a *prima facie* case to modify the protections of the automatic stay.  Specifically, the Bank

asserted in justification of its decision to terminate the Accounts, that it simply had become

"dissatisfied with its relationship with the Debtors" and that there was a "possibility" of harm in

the future if the Debtors did not pay their monthly account fees, notwithstanding the fact that the

Debtors had no secured creditors and approximately $11 million in the Accounts at the time.

Movant also determined separate and apart from the Section 362 issue, Section 365 of the Code

precluded the Court from granting the Bank Stay Motion, arguing that the account agreements at

issue were executory contracts under which the Bank was required to provide services until such

time the Debtors decided to assume or reject it.

Adding insult to the threatened injury, the Bank filed as exhibits to the Bank Stay Motion un-redacted applications submitted by the Debtors to open the Accounts, which included personal information of the Debtors' principals, including dates of birth and social security numbers. Movant noticed the problem and immediately informed the Bank and demanded immediate action to remedy, which the Bank did in the form of filing a motion to redact consistent with the Bankruptcy Rule 9037 [Docket No. 247]. The Court heard initial argument on the Bank Stay Motion on July 21, 2015 and entered a scheduling order [Docket No. 261] for additional briefing. The Bank filed a reply in support of its motion on July 28, 2015 [Docket No. 269], and Movant prepared a further response based on the arguments therein [Docket No. 282] and timely filed it on August 11, 2015.

Due to the arguments and factual misstatements contained in the Bank's reply, in addition to conducting additional research and analysis of the legal issues (again focused on Sections 362 and 365 of the Code), Movant worked closely with the Debtors' to review the Debtors five-year history with the Bank and to draft a Declaration by Randall Olech to address same. Movant also prepared and served discovery requests on the Bank in order to flesh out whether any support existed for the conclusory allegations made in its pleadings. The discovery and Olech Declaration were made necessary to correct assertions made by the Bank in its response without any evidentiary support or foundation.

After hearing additional argument on August 18, 2016, the Court asked for a supplemental brief on whether the "at-will" termination provision in the Accounts agreement controlled the decision to modify the protection of the automatic stay. Movant engaged in comprehensive research, review and analysis of the issue and corollary legal issues dispositive of the Bank Stay Motion, and filed its *Supplemental Response* [Docket No. 291] on August 27,

2016. There were no cases directly on point issued by the Seventh Circuit, but numerous

bankruptcy courts found that an at-will termination clause in a contract does not, by itself,

mandate modifying the stay.  Importantly, Movant found no Seventh Circuit precedent requiring

a bankruptcy court to modify the stay based solely on an at-will termination clause.  Thus,

Movant encouraged the Court to follow the Seventh Circuit requirements to consider and balance

the harm that the Debtors and their estates would suffer if the stay is modified.  Based on the

arguments presented by Movant, the Court recognized that such harm was greater than any

alleged harm to the Bank.  Movant also researched and presented an argument that allowing the

Bank, a non-debtor party, to contract around Section 362 of the Code, would contravene public

policy and dismantle Congressional mandates as the stay is one of the most fundamental

protections provided to debtors under bankruptcy laws.

The Court took care to analyze this issue and allowed the parties additional oral argument

at numerous continued hearings on the motion, including hearings held on September 1, 8, 15

and 22, 2015.  During these hearings, the Court made clear that notwithstanding the above-

arguments, it had concerns that denying the Bank Stay Motion would infringe on the sanctity of

a contract.  Movants took the Court's comments to heart and discussed the matter on many

occasions with the Debtors and counsel for the Bank to determine if some consensual resolution

was available. With no apparent settlement available, Movant also researched and analyzed the

Debtors' ability to stay the Court's ruling if it granted the motion and thereby preserve the status

quo while the Debtors appealed any adverse ruling.  While confident a stay would be available,

the Debtors were leery of spending additional time and attorneys' fees to prosecute both an

appeal and the necessary motions to obtain a stay.  Fortunately, in the minutes leading up to the

September 22nd hearing, Movant and counsel for the Bank in engaged in one last effort to reach a

settlement before the Court ruled, and were able to outline a resolution that each believed would

be acceptable to their respective clients.  After the parties informed the Court of this, the hearing

was continued to October 6, 2015, for entry of a formal stipulation and agreed order to resolve

the Bank Stay Motion.

Over the next week Movant worked with counsel for the Bank and the Debtors to flesh

out and document the terms of the agreed resolution, which Movant jointly drafted and filed with

the Court [Docket No. 320] on October 1, 2016.  Movant jointly presented the stipulation to the

Court on October 6, 2015, which resulted in an order approving the stipulation and the

withdrawal of the Bank Stay Motion, entered by the Court on October 6, 2015 [Docket No. 322].

In short, the Debtors were able to resolve threatened termination of the Accounts and the Bank

Stay Motion by agreeing to pay the Bank $12,500 upon the Court approving the settlement,

$2,500 per month for the next 8 months, and $5,000 per month thereafter so long as the Debtors

required use of the Accounts.  Notwithstanding this monetary solution, which the Bank initially

insisted could not cure the problems alleged in the Bank Stay Motion, in total the matter took

nearly seven (7) months to resolve after the Bank first issued its termination letters.

2.  **Prepetition Wage and Benefit Motion.**  Movant assisted the Debtors in

maintaining its workforce while complying with restrictions on paying prepetition debts.  To that

end, Movant prepared and presented a motion to pay certain employee wage and benefit

obligations [Docket No. 38], which was granted by the Court. As is unavoidable in cases the size

of the Chapter 11 Cases, the timing of the filing of this occurred between payroll periods and

created prepetition priority wages claims in favor the of the Debtors for approximately 242 full-

time employees, some of whom were unionized.  Movant worked with the Debtors' management

in immediately addressing inquires they received from employees to answer their concerns about

the impact the filing of the Chapter 11 Cases on their outstanding and future wages.  In addition,

Movant knew that if the Debtors' efforts to reorganize were to proceed, the Debtors had to

immediately and conclusively address all outstanding employee priority wage and benefits

obligations.

Movant's analysis of the underlying wage and benefit obligations was particularly

demanding because the Debtors had union and non-union employees, and utilized three different

payroll processors, each with different procedures for funding and issuing paychecks, and had

both weekly and bi-weekly pay periods.

Movant was able to ascertain with assistance of the Debtors' management that the wage

claims in question were priority claims in accordance with Sections 507(a)(4) and (5) of the

Code. Movant's efforts also allowed the Debtors to pay all prepetition payroll taxes and maintain

all prepetition employee wage-related benefits, such as health, dental and life insurance programs

and contributions to retirement 401(k) plans.  These efforts maintained critical employee

continuity.

3.    **Key Employee Retention Bonus Motion**.  From the outset of the Chapter 11

Cases, the Debtors sought Movant's assistance in determining what relief was available under

the Code to ensure retention of two of their key non-insider employees for the balance of the

bankruptcy proceedings.  These two employees were, and remained throughout almost all of the

Chapter 11 Cases, critical components of the financial and day-to-day operations of the Debtors'

businesses, and thus were necessary for the Debtors' administration of, and continued objectives

in, the Chapter 11 Cases.  Movant worked with the Debtors to draft an economically feasible

retention bonus program that would incentivize these key employees to remain with the Debtors

throughout the Chapter 11 Cases and to limit the uncertainty the Debtors would face if they had

to replace such critical employees during the initial stages of the Chapter 11 Cases and

thereafter.  Movant drafted and filed the appropriate motion [Docket No. 66] seeking relief in

compliance with Sections 363 and 503 of the Code.

Movant also worked with the UST to provide significant additional information related to

the two key employees and in support of the motion.  As part of this secondary due diligence,

Movant demonstrated that Sections 503(c)(1) and (2) of the Code did not apply as the employees

were not "insiders" of the Debtors as provided in Section 101(31) of the Code.  With the UST's

support, the Court entered an order approving the retention bonuses on January 20, 2015 [Docket

No. 88], and the Debtors ultimately retained these key employees through the duration of the

Chapter 11 Cases.

**4.**    **Customer Programs and Relations.**  The retention of the Debtors' existing

customers and the encouragement of new customer relationships were critical to the Debtors'

efforts to maintain operations in the ordinary course immediately upon the filing of the Chapter

11 Cases.  Movant reviewed and analyzed with Debtors their series of programs and policies

which had always fostered and maintained positive relationships with their customers.  Such

programs were designed to ensure customer satisfaction, develop and sustain customer loyalty,

and generate goodwill for the Debtors and their races, and ultimately to improve profitability of

the businesses.  To ensure continued support of the Debtors' customers through these programs,

Movant filed a motion [Docket No. 9] and ultimately obtained a court order [Docket No. 45] to

continue the underlying customer programs and to honor all obligations to customers that arose

prepetition through such programs, including "outs" obligations, which are uncashed customer

winning tickets. For this latter endeavor in particular, Movant expended significant time within a

short period to obtain a working knowledge of terms, programs and regulations that are unique to the horse racing business in Illinois.

5.    **Utilities Service and Related Section 366 Motion.** The Debtors maintained approximately twenty four (24) separate accounts with various utility companies.  As utility services were essential to the Debtors' continued operations, Movant prepared and filed a motion [Docket No. 61] to authorize the payment of postpetition deposits with various utility companies and to allow certain prepetition deposits to be deemed adequate assurance of payment under Section 366 of the Code. Movant worked closely with the Debtors and handled inquiries from various utilities to ensure uninterrupted utility services prior to the entry of a Section 366 order. Thereafter, Movant prepared correspondence to the subject utilities to both provide the applicable deposits and explain the effect of the court order, and was further required to help to ensure compliance with the order.  In particular, Movant worked with general counsel for one major supplier of electricity and gas with prepetition deposits to allow such deposits to be appropriately setoff under Section 366 and have the remaining prepetition deposit be treated as a post-petition deposit under the court order.  As a result, Movant helped the Debtors save approximately $50,000 in post-petition utility deposits.

6.    **Preparation of Schedules, Statement of Financial Affairs and Rule 2015.3 Reports.**  Given the size and complexity of the Chapter 11 Cases, the many matters unique to the horse racing industry, the Debtors' long history, and the exigent circumstances that necessitated the expedited Chapter 11 filings, the preparation of the Debtors' Bankruptcy Schedules (collectively, the **"Schedules"**) and Statements of Financial Affairs (collectively, the **"SOFA"**) were major time consuming tasks. Despite the significant commonality of the Debtors' overall operations, the fact remained the Debtors operated at separate facilities, had separate assets and

liabilities, maintained separate books and records, separate bank accounts, separate utility

accounts, had many separate executory contracts, and dealt with different taxing authorities,

many employees and vendors. As a result, each of the Debtors required their own distinctive

Schedules and SOFA, doubling the task for Movant.

Initially, the Debtors required, and Movant obtained, an extension of the deadline

to file their Schedules and SOFAs pursuant to court order [Docket No. 41].

Movant continually worked with the key personnel and management of the Debtors to

prepare and file the Debtors' extensive Schedules and SOFA on a timely basis.  To do so

required Movant to undertake a painstaking review of a multitude of records, documents, and

other financial information, participate in daily and numerous telephone conferences, exchanges

of emails, and various office visits with the Debtors' management, and revise and edit numerous

and lengthy drafts. Reviewing underlying business records and drafting accurate Schedules and

SOFA required an enormous time commitment due in part to (a) the integrated business model

the two Tracks employed separately, (b) the related amount of intercompany transactions that

occurred as part of the Debtors' ordinary course of business, (c) the heavily regulated and largely

unique horseracing industry, and (d) the sheer volume of the Debtors' cash transactions that

processed wagers for races and/or simulcasts throughout the county and abroad.  Emails and

telephone conferences often numbered in the dozens on a daily basis. Many exhibits were

reviewed and Movant's questions needed to be addressed to ensure the Schedules and SOFA,

and the many exhibits thereto, all contained the necessary information in an understandable

manner. Multiple revisions of exhibits were made to put information which was in the Debtors'

record-keeping systems in a practical format.  Movant's efforts continued extensively for weeks.

In Movant's experience, the preparation of thorough, detailed and descriptive schedules and

statements of financial affairs fosters better communication with creditors and other interested

parties. Due in large part to Movant's efforts and perseverance, the thoroughness of the

Schedules and SOFA certainly aided in moving these Chapter 11 Cases forward in a productive

manner throughout the Operational and Liquidation Periods.

Movant also prepared for the Debtors' review and approval the detailed financial reports

required under Bankruptcy Rule 2015.3 for three different entities in which the Debtors have a

20% (or more) ownership interest. While not as complex and detailed as the Schedules and

SOFA, complying with Rule 2015.3 and the appropriate local forms required Movant's review

and analysis of detailed financial information and descriptions, and preparation of numerous

drafts.

7.    **Reinstatement of Lottery Services.**  The Debtors offered access to Illinois

lottery games and tickets at Maywood's six OTB locations. This enhanced customer attendance.

Due to a prepetition payment that did not clear, the Illinois Department of Lottery (the "**Illinois**

**Lottery**") revoked the Debtors' license to offer lottery products. Movant understood the

restoration of the lottery services was very important in maintaining customer satisfaction, avoid

losing current customers, and attracting new customers. Movant quickly contacted the necessary

management-level employees of the Debtors responsible for these services, and the Illinois

Attorney General's counsel to discuss the immediate restoration of the applicable licenses,

notwithstanding outstanding prepetition claims. Movant determined that under Illinois law and

Section 541 of the Code, a strong argument existed that the proceeds from the lottery-related

payments the Debtors received were not property of the estates, and thus could be used to pay the

prepetition claim of the Illinois Lottery. Ultimately, Movant worked with an attorney from the

Illinois Attorney General's office who, with Movant's assistance, filed the necessary motion

seeking Court approval of this understanding and authorizing the Debtors to pay the Illinois

Lottery claims from certain lottery "trust funds." Movant was also required to help the Debtors

reconcile resulting trust funds with prepetition and postpetition claims. Upon Court approval,

the Illinois Lottery promptly reinstated the Debtors' licenses while the parties reconciled the

applicable claims and payments.

       **8.**     **<u>Monthly Debtor in Possession Operating Reports.</u>** Movant worked with the

Debtors to ensure the timely filing and dissemination of the debtor in possession operating

reports and other financial statements. More so than in many typical Chapter 11 cases, the

Debtors' initial reports required significant analysis and attention due to the unique nature of the

Debtors' businesses. Specifically, advance deposit wagering and simulcast agreements for on-

track and off-track wagering at the Tracks and OTBs for races run at the Tracks and third-party

tracks throughout the country had significant cash flow that did not correlate to the Debtors'

accounts payable or accounts receivable. Such transactions complicated debtor-in-possession

reporting.

       In all, throughout these Chapter 11 Cases, Movant participated in the preparation and

filing of twenty (20) months of required debtor in possession monthly operating reports. Each of

the monthly reports was highly detailed. Often Movant was asked by interested parties to obtain

explanations for certain entries given the complexities of the Debtors' financial transactions. In

each case, Movant discussed the inquiry(s) with the Debtors' management and provided the

party requesting the information a detailed explanation of the particular entries. At certain times,

Movant was also asked to produce the supporting documentation which it obtained and reviewed

with the Debtors' management to ensure relevancy, and thereafter provided to the party in

question.

9.      **Analysis of Segregated Funds.**  The uncashed tickets ("outs"), referenced above were just one category of funds that the Debtors maintained in segregated bank accounts.  As of the Petition Date, the Debtors also segregated certain funds (a) to satisfy the Purse obligations under the IHHA contract and the Horse Racing Act, and (b) payments to the horse owners for stakes races.  Movant was required to research and examine to what extent such funds could be considered to be held in trust under Illinois law, the Horse Racing Act and/or the IHHA contract.  Movant used this analysis and research to advise the Debtors as to their obligations as to such funds, and to the extent necessary, sought Court authority to fulfill such obligations to protect the funds (*e.g.,* the stakes motion hereinafter described and the customer programs motion).

10.      **Application to Retain Litchfield Cavo as Special Counsel.**  As more fully described below, when the IRB issued its Annual Dates Order for 2016 it did not award any racing dates to the Debtors.  While pursuant to the 2015 Annual Dates Order the Debtors had racing dates through the end of 2015, as a result of the loss of 2016 racing dates and in conjunction with the Debtors' effort to sell their businesses, it became apparent that the Debtors were going to sustain significant employment losses.

During the Chapter 11 Cases Movant conducted initial research and informally advised the Debtors of potential implications of employment losses, particularly with respect to the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.*, and the Illinois Worker Adjustment and Retraining Notification Act, 820 ILCS 65/1 *et seq.* (collectively, the "**WARN Acts**"), as Movant does not have labor law expertise.  The potential implications of the WARN Acts became more acute as a consequence of the 2016 Annual Dates Order. Accordingly, Movant worked with Debtors to vet and retain special counsel under Section 327(e)

of the Code with a practice involving the WARN Acts.   Movant drafted, filed and prosecuted

that certain *Application of Debtors to Employ Litchfield Cavo, LLP as Special Counsel* [Docket

No. 339], filed on November 13, 2016.  The Court granted the application in an order entered

November 17, 2015 [Docket No. 340], thereby authorizing Debtors to employ Litchfield Cavo as

legal counsel to the Debtors to provide legal services, including consultation and advice, solely

with respect to issues arising under or relating to the WARN Acts.

Leading up to formal retention (which was effective as of November 5, 2015) and after

the entry of the order approving the application, Movant worked with the Debtors to ensure

Litchfield Cavo was aware of all pertinent circumstances related to the Debtors' business

operations, to implement the wind down of the Chapter 11 Cases, to assist special counsel and

the Debtors in complying with all applicable provisions of the WARN Acts.  Movant thus had

numerous conversations and communications with representatives of both the Debtors and such

special counsel, often related to the required communications to employees under the WARN

Acts.

**11.**     **Motion to Authorize New Agreement with Xpressbet, LLC.**  Advance deposit

wagering ("**ADW**") is a system whereby customers deposit funds into online accounts, which

they can then use to wager on horse races both in Illinois and elsewhere.  Illinois law allows

horse racing licensees like the Debtors were to maintain ADW systems, or to contract with third

parties (subject to approval by the IRB) to maintain ADW systems. As of the Petition Date,

Maywood (doing business as "**BetZotic**") maintained an ADW system that allowed its

customers, in part, to deposit funds into an account for wagering on future races at the Debtors'

tracks or many other tracks, either online (at www.BetZotic.com) or through an automated teller

over the telephone.

Xpressbet, LLC ("**Xpressbet**") operates an ADW service that allows its customers to wager on horse races at over 300 U.S. and international racetracks, and provides customers live video streaming of many races. As part of its decision not to continue its business relationship with one of the Illinois Tracks, Xpressbet made overtures to the Debtors to provide its ADW system. Movant worked with Debtors to evaluate the offer and to review and revise the proposed terms of Xpressbet's offer, and negotiated same with counsel for Xpressbet. This led to Debtors and Xpressbet entering into a term sheet dated April 2015 (as subsequently modified by the parties, the "**ADW Agreement**"), under which the Debtors would enable Xpressbet to make its ADW system available to Illinois residents. Under the ADW Agreement, Xpressbet had to, among other things: Provide and maintain its ADW system to residents of Illinois on an exclusive basis through the Debtors; and remit to the Debtors an agreed-upon portion of all revenue generated through the ADW system by residents of Illinois. Under the ADW Agreement, Maywood was permitted to continue to operate BetZotic ADW system.

The Debtors viewed entry into the ADW Agreement as a great benefit to their operations as it required little costs or obligations to Debtors and provided a new revenue stream. Nonetheless, certain hurdles existed to proceeding with the new agreement, which Movant helped the Debtors to clear. Among other things, Movant advised Debtors with respect to the terms of the ADW Agreement and suggested various revisions thereto. Movant also attended the IRB's monthly meeting on May 19, 2015 (the "**May Meeting**"), in which the IRB granted Xpressbet an advance deposit wagering license to operate pursuant to the ADW Agreement during the remainder of calendar year 2015. Before granting the license, members of the IRB posed questions to Movant with respect to the bankruptcy implications of the Debtors entering into and performing under the Agreement.

Movant circulated copies of the ADW Agreement to Judgment Creditors' Counsel, and discussed the net benefits of proceeding therewith. The Judgment Creditors in turn advised that they had no objection to the Debtors' future business operations under the ADW Agreement (subject to one modification, which the Debtors negotiated with Xpressbet and incorporated with assistance of Movant), and but expressed a preference for the Debtors to obtain approval from this Court before proceeding. Over the course of negotiations (which extended over several months) and at the May Meeting, Xpressbet and the Debtors conveyed to the IRB that they both believed this transaction to be in the ordinary course of the Debtors' businesses and thus no court approval would be required under Section 363 of the Code. Thereafter, Xpressbet restated its preference to obtain approval from this Court.

Based on Movant's review and advice, the Debtors believed that, based on their pre-petition conduct and the nature of the contemplated transaction, entering into the ADW Agreement constituted a transaction in the ordinary course of business authorized by 11 U.S.C. § 363(c). Nonetheless, because both Xpressbet and the Judgment Creditors requested formal approval of same by this Court, Movant prepared, filed and prosecuted that certain *Motion for Order Authorizing Debtors to Enter into Agreement with Xpressbet, LLC* [Docket No. 279], which it filed on August 5, 2015. Movant argued that entering into the ADW Agreement represented a sound business decision of the Debtors as, among other things, it allowed the Debtors to generate additional revenue from assets they already possess and maintain—their racing licenses, with minimal additional costs. No objections to the motion were raised, but some additional work was required by Movant, who was required to convince counsel for Xpressbet that the modification to the ADW Agreement presented by the Judgment Creditors was necessary and reasonable. Eventually, Movant was successful and an order granting the

43

motion and modifying the ADW Agreement accordingly was entered by the Court on August 19,
2015 [Docket No. 286].

      **12.**      **Crum & Forster Motion to Authorize Debtors' Insurance Policy.** Crum &
Forster Indemnity Company ("**Crum**") issued a workers compensation insurance policy to the
Debtors for the policy period December 31, 2013 through December 31, 2014.  Prior to the
Petition Date, Debtors made arrangements to renew the Crum insurance coverage and entered
into a new workers compensation insurance policy for the policy period December 31, 2014
through December 31, 2015 (the "**New Policy**").  No premium was due under the New Policy
until after the Petition Date, which the Debtors paid in the ordinary course of business.  On
February 18, 2015, representatives of Crum sent an email to Debtors with a series of questions
related to the Chapter 11 Cases, the Judgment, Rule 2004 subpoenas issued by the Judgment
Debtors and the New Policy.  Due to the legal nature of the questions posed, Movant provided
direct responses to the Crum email and advised Debtors as to whether further or formal action
was required. As part of its reply, Crum introduced Movant to its legal counsel and asked that
Movant work with counsel to have an order entered in the Chapter 11 Cases effectively blessing
the Debtors' entry into the New Policy and providing a series of protections from Crum.

      Movant engaged in negotiations with Crum through its counsel, and generally advised
Debtor that the protections sought by Crum were overreaching and that the proposed order was
effectively a "comfort order" as the Debtors had entered into the New Policy prior to Petition
Date, and that the Debtors post-petition actions in connection with the New Policy were within
the ordinary course of its business.  Accordingly, the Debtors instructed Movant not to move
forward with the requests by Crum, namely to have Movant draft a motion to have an order (sent
by Crum's counsel on April 27, 2015) entered by the Court.

On August 17, 2015, Crum filed a motion [Docket No. 284] purported seeking authority for the Debtors to enter into the New Policy, which had been in effect for 8 months (the "**New Policy Motion**").  In the New Policy Motion, Crum asserted its belief that the Debtors had in fact entered into the New Policy with Crum in the ordinary course of business; admitted the premium had been paid in full; and stated that the transaction was thus appropriate under Section 363(c) of the Code.  Nonetheless, Crum sought a ruling from the Court that, among other things, any future payment obligations under the New Policy be afforded administrative claim priority status, and that the automatic stay be modified proactively to allow Crum to administrate the New Policy, and if necessary, cancel the New Policy in the ordinary course in the future. Movant advised Debtor and worked with counsel for Crum to make significant and substantive revisions to the proposed order to limit its scope, which consistent with the prior requests of Crum, was overreaching in many instances.  Crum accepted the vast majority, if not all of, Movant's proposed changes, which were evidenced in a redline copy of the order sent by Crum to the Court on September 17, 2016.  The Court entered a revised order [Docket No. 315] on September 21, 2016, granting the New Policy Motion in the form revised by Movant and agreed to by Crum.

**13.    Motion to Modify the Stay to Facilitate Pari-Mutuel Settlement Procedure.**

As part of the Annual Dates Order, the IRB awards the Illinois Tracks "host status" for certain hours on certain dates, during which the "host" track earns a 4% Commission on all wagers placed on intrastate races simulcast in Illinois (at the tracks and OTBs).  Generally, the Debtors were the host track for the nighttime races in Illinois, and the other Illinois Tracks were host for daytime racing.  Each Illinois Track generally ran live racing and simulcasts another track's races (broadcast at its track and at its OTBs) at various times throughout any given week.

The Illinois Tracks were thus obligated to pay various statutory fees and Purse and Commission allocations in connection with those races, and at the same time generated receivables for live racing simulcast by other tracks and during the times it is designated with "host status" (collectively "**Pari-Mutuel Settlement Debts and Receivables**"). Each of the Illinois Tracks regularly simulcasted races held at the other four Illinois Tracks, resulting in a series of Pari-Mutual Settlement Debts and Receivables which had to be reconciled on a regular basis. Given the important place simulcasting had in the Debtors' business operations, Movant was required to analyze and learn the nature and effect of such reconciliations, both with respect to the Illinois Tracks and with out-of-state race tracks and OTBs.

As discussed in Section B(3) below, in April 2015, the Debtors obtained an order from the Court granting the "Settlement Acceleration Motion", as defined below, in connection with the 2015 Annual Dates Order, which required the reconciliation of certain Pari-Mutuel Settlement Debts and Receivables to occur on a 15-day cycle (as subsequently amended, the "**IRB Settlement Procedures**").

Movant determined that in the settlement process routinely undertaken by the Illinois Tracks, it was customary for any two tracks to set off Pari-Mutuel Settlement Debts and Receivables, such that the only payment required was the net balance of Illinois Tracks' obligations to one another. This was the Debtors' practice in the ordinary course of their businesses prior to the Petition Date, which they had continued thereafter during the Chapter 11 Cases. In preparing the Schedules and Statement of Financial Affairs, Movant worked with Debtors to determine Pari-Mutuel Settlement Debts and Receivables for races run and simulcast during the weeks leading up to the Petition Date. But because the IRB Settlement Procedures

were a rolling process and the applicable settlement period was not complete as of the Petition

Date, the exact amounts of these debts and receivables were not yet known.

For several months during the Chapter 11 Cases, Movant worked with the Debtors and

with counsel for Hawthorne, to finalize the relevant Pari-Mutuel Settlement Debts and

Receivables owed among the Illinois Tracks.  Movant determined that net balance was owed

from Hawthorne to Debtors when netting out prepetition and post-petition Pari-Mutuel

Settlement Debts and Receivables.  Given the complex nature of these settlements, and that some

took three to six months to reconcile while others only took a matter of weeks, and the fact that

Debtors had similar settlements in the ordinary course of with hundreds of tracks and OTBs

nationwide, no comprehensive program had been established for reconciling prepetition

settlement against post-petition settlements. However, with respect to Hawthorne in particular,

the Debtors believed that existence of outstanding prepetition Pari-Mutuel Settlement Debts and

Receivables caused difficulties in the Debtors' collection of prepetition receivables and had

consequently affected the pari-mutuel settlement process post-petition.

Accordingly, Movant was required to become conversant with the Pari-Mutuel

Settlement Debts and Receivables owed by and among the Debtors and Hawthorne; assisted in

negotiating a final net payment which would be due from Hawthorne to the Debtors for

prepetition transactions, and then drafted, filed (on December 3, 2015); and presented a motion

seeking authority allow them (but not require them) under Section 553 of the Code to set off

mutual, prepetition Pari-Mutuel Settlement Debts and Receivables obligations owed among them

and any Illinois Track [Docket No. 349]( the "**Setoff Motion**").  Movant further had numerous

discussions with Judgment Creditors' Counsel to fully explain the nature and the need for the

relief requested in the Setoff Motion, and to negotiate certain safeguards for problems the

Judgment Creditors perceived to exist in the proposed setoff process. Movant also worked with

counsel for the IRB to ensure that it understood and supported the Setoff Motion. On December

8, 2015, the Court entered an order, modified by the negotiations between Movant and the

Judgment Creditors' Counsel on behalf of their respective clients, granting the Setoff Motion

[Docket No. 355]. Pursuant thereto, Movant presented future proposed setoffs of Pari-Mutuel

Settlement Debts to counsel for Judgment Creditors and obtained their consent prior to the

Debtors effecting same and obtaining a net benefit to the estates.

14.   **Motion to Wind Down Operations.** As of December 31, 2015, all live racing

activity at the Tracks ceased due to the loss of licensing and the Debtors' inability to run any live

races in 2016. The Debtors' primary revenues had come from pari-mutuel wagering on the races

run at their Tracks. The inter-track wagering ("**ITW**") and OTB operations, by themselves, did

not generate a profit for the Debtors, and without live racing available in 2016 there would be no

net benefit to the estate of their continued operation. Over the course of a nine (9) month

marketing and sale process, no bids had been received for Maywood or Balmoral as going

concerns. Because the Maywood Park Lease was deemed rejected pursuant to Section 365(d)(4)

of the Code as of December 31, 2015, and because racing operations had by then ceased entirely,

the Debtors, Movant and their investment banker did not foresee any going concern bids to be

forthcoming.

Therefore, after Movant consulted with the Debtors and the Judgment Creditors'

Counsel, Movant drafted the necessary motion seeking the Court's authorization to complete a

wind down of the Debtors' remaining operations and to cease the remaining OTB and ITW

operations (collectively, the **"Wind Down"**). Given the confluence of unfortunate events in

2014 and 2015 (*i.e.*, entry of the Judgment, failure to enact gaming legislation, a loss of 2016

race dates, and the resulting lack of interest in the purchase of the Debtors' operations), the

Movant and Debtors believed that a Wind Down was inevitable and necessary in the best

interests of their creditors. Movant advised Debtors that, by definition, the Wind Down was

outside the ordinary course of business and involved property of their estates, so it was necessary

to seek authority to implement the Wind Down under Section 363(b)(1) of the Code.

Accordingly, Movant drafted, filed and presented to the Court that certain *Motion of

Debtors for Authority to Wind Down and Cease Remaining Operations* [Docket No. 397].

Movant reached out to counsel of key constituencies with respect to the motion, including the

UST, the Judgment Creditors and the IRB.  Based on such efforts and communications with the

parties' counsel, Movant made certain revisions to the proposed order and garnered support for

the motion, which the Court entered on January 19, 2016 [Docket No. 399], after no party

formally objected. The Debtors and Movant informed the IRB of their decision to implement the

Wind Down and that they would no longer use the applicable ITW and OTB licenses at the

regularly scheduled IRB hearing held on January 26, 2016.

15.   **Claims Bar Date Motion.**  Movant prepared the motion and related documents

to set a bar date for the filing of claims in the Chapter 11 Cases, which is critical in any chapter

11 case to facilitate a successful conclusion to the case, whether through a plan of

reorganization, sale efforts or otherwise.  In that regard, the Debtors and Movant required the

ability to assess the extent of existing prepetition claims in the case.  Accordingly, Movant filed

the relevant motion [Docket No. 208] on May 27, 2015.  After obtaining Court approval and

entry of an order setting August 6, 2015 as the last day to file proofs of claim in the Chapter 11

Cases (the **"Claims Bar Date"**), Movant sent the court-approved form of notice to the

approximately 1,000 known creditors and parties conducting business with the Debtors,

including parties to executory contracts and unexpired leases (see Certificate of Service at Docket No. 228).

Two claimants filed motions for allowance of late filed claims, which were premised on the same issue, *i.e.* withdrawal liability under the Multiemployer Pension Plan Amendments Act of 1980. Both claimants were multiemployer defined-benefit pension plans governed by the Employee Retirement Income Security Act of 197 4 ("**ERISA**"). Prior to the Petition Date, Debtors were signatory to Collective Bargaining Agreements with the Local 134 I.B.E.W., which required Debtors to make contributions to a specific pension trust (the "**134 Fund**"), and with Teamsters Local Union No. 727, which required Maywood to make contribution to a separate pension trust (the "**727 Fund**" and with the 134 Fund, the "**Funds**").

On January 28, 2016, the 134 Fund filed a motion seeking acceptance of a late filed proof of claim for cause [Docket No. 406]. In its motion, the 134 Fund alleged that under applicable law it was not required to file a proof claim until after a "complete withdrawal" occurred under ERISA, which did not occur until after the Claims Bar Date; and sought allowance of its claim for withdrawal liability in an amount in excess of $5 million. In response to the filing, Movant researched both the factual and legal basis for the 134 Fund's claim and the viability of having the claim deemed timely filed, and worked with the Debtors, Judgment Creditors' Counsel and the 134 Fund counsel in connection with same. While the parties initially established a briefing schedule for the matter, ultimately they decided that the best course of action was to allow the claim to be filed and deemed timely filed, so long as all merit-based defenses were preserved for the Creditor Trustee. As such, Movant attended the hearings related to the 134 Motion, engaged in numerous communications with the relevant parties, and negotiated an order with Judgment Creditors' Counsel and the 134 Fund counsel to accept same. On February 22, 2016, the Court

entered an agreed order [Docket No. 433] that allowed the Debtors, the Judgment Creditors and the Creditor Trustee to object to the 134 Fund's claim on any basis other than timeliness.

After the filing of 134 Fund claim, counsel for the 727 Fund contacted Movant about the status of the Chapter 11 Cases, the Plan and the Claims Bar Date.  Movant had several conversations with counsel, and reviewed the record and analyzed whether the 727 Fund had received notice of the Claims Bar Date.  Thereafter, the 727 Fund filed its own motion seeking acceptance of a late filed proof of claim for cause [Docket No. 513], which pleading mirrored the motion filed by the 134 Fund.  The major difference between the two motions was that the 727 Fund asserted a claim of only $11,374, compared the to $5 million claim of the 134 Fund. Movant discussed this matter with the Debtors and with the Judgment Creditors' Counsel, all of who agreed that in light of the case law that supported the 727 Fund's motion, the facts that supported the claim, and the small size of the alleged claim relative to the claim universe (which at the time was believed to be around $90+ million), that the motion should be approved.  With no objections filed or presented at the hearing on May 17, 2016, the Court entered an order [Docket No. 531] authorizing the 727 Fund to file a late proof of claim and deeming such claim to be timely filed.

## B. ILLINOIS RACING BOARD MATTERS

**SERVICES RENDERED:**

| ATTORNEY | HOURS | RATE | VALUE |
|----------|-------|------|-------|
| AFB | 35.20 | $325.00 /hr | $11,440.00 |
| CHG | 83.80 | $525.00 /hr | $43,995.00 |
| NQR | 150.20 | $435.00 /hr | $65,337.00 |
| **TOTAL** | **269.20** | | **$120,772.00** |

Movant expended approximately 269.20 hours (see <u>Group Exhibits B(1) - B(15)</u> attached hereto) during these Chapter 11 Cases in matters involving the Debtors' governing body, the IRB. There have been five (5) primary areas of services involving Movant's services in this category during these Chapter 11 Cases:

  i. Attendance and participation at approximately eleven (11) IRB monthly meetings, including those held at Maywood Park, Hawthorne and Arlington, preparation of regular status reports to the IRB, communications with counsel and representatives of the IRB, and assistance to the Debtors concerning continued compliance with the rules and regulations of the IRB and Horse Racing Act;

  ii. Issues regarding the "Stakes Motion", as defined below;

  iii. Issues regarding the Settlement Acceleration Motion;

  iv. Issues regarding the "Race Dates Reduction Motion", as defined below; and

  v. Issues regarding the "IRB Race Dates Rejection", as defined below.

--------------------------------------------------------------------------------

  **1.**  **IRB Meetings.**  As stated, the IRB was the Debtors' governing and regulatory governmental agency. Compliance with the IRB's rules and regulations was essential to the continued operation of the Debtors' businesses and the success of these Chapter 11 Cases.

  As more fully set forth in the IRB website (<u>www.illinois.gov/irb</u> ), the IRB consists of eleven members appointed to six-year terms by the Governor of Illinois. The IRB has the responsibility of enforcing Horse Racing Act. Each year the IRB issues racing licenses and establishes a racing schedule for every Illinois Track in operation, both thoroughbred and harness. The race date allocation process involves an examination by the IRB of each racetrack's application for a racing license. Factors include what is in the best interest of Illinois racing, the

racetrack's facilities, public accommodations, anticipated tax revenues, the extent of promotional and marketing activities, the character, fitness, reputation and integrity of the racetrack's owners and operators, and each racetrack's compliance with affirmative-action plans. OTB licenses are likewise issued by the IRB on an annual basis with each of the operating Illinois Tracks being entitled to up to six OTB licenses. There are strict rules concerning the locations of OTBs, such as distances from any church, school or residence, among other things. Further, the IRB audits the receipt and disbursement of all racing revenues. IRB pari-mutuel auditors at each racetrack ensure that all collections and disbursements are made correctly and timely.  IRB retains veterinarians to supervise the horses' physical conditions, and IRB security personnel closely monitor the premises during races.

The IRB is tasked with ensuring the "honesty and integrity of all horse races conducted in Illinois".  All racing participants, in whatever capacity, must be licensed by the IRB every year. Just as the participants are licensed, as stated, so too are the operating Illinois Tracks. The IRB's web site states plainly: "***Once issued, a license may be suspended or revoked by the Board for any just cause*** [emphasis added]."

Among its other duties, the IRB conducts monthly meetings at the James R. Thompson Center in downtown Chicago and at the Illinois Tracks. Written agendas are distributed. Representatives and counsel of the various Illinois Tracks are required to attend and testify to the matters pertaining to their operations set forth on the agenda for such meeting. Throughout the Chapter 11 Cases, the Debtors' representatives, including Movant, were required to attend every monthly IRB meeting and testify on matters relating to the Chapter 11 Cases . Representatives of the IHHA and numerous other interested parties also attend and often testify as to matters affecting their interests.

The IRB, as well as the other Illinois Tracks and the IHHA, were acutely aware of, and interested in, these Chapter 11 Cases, as the Debtors' represented 50% of the horse racing venues in northern Illinois.  The outcome of the Chapter 11 Cases was of major importance to the entire Illinois horse racing industry and the thousands of persons involved in the agribusiness arising therefrom. Throughout the Operational Period and continuing into the Liquidation Period, at each monthly IRB meeting, a significant agenda item was:

**Report by Representatives of BALMORAL RACING CLUB, INC. and MAYWOOD PARK TROTTING ASSOCIATION, INC. on their financial status and Chapter 11 bankruptcy proceedings**.

As required, Movant attended each of the monthly IRB meetings and testified as to the status of the Chapter 11 Cases and answered a variety of questions from the IRB Commissioners as to numerous facets of the Code as they affect Chapter 11 debtors in possession. Prior to each monthly meeting, Movant was primarily responsible for preparing written status reports updating the IRB on all actions taken in the Chapter 11 Cases. In all, Movant prepared and submitted eleven (11) monthly reports to the IRB. In addition, throughout these Chapter 11 Cases, counsel to the IRB routinely contacted Movant with questions or requests for information concerning certain pending matters in the Chapter 11 Cases.

As stated, the IRB had the right to suspend or revoke any of the Debtors' Organization Licenses, Wagering Licenses or Inter-Track Wagering Licenses (permitting simulcast wagering at the Debtors' OTBs) for "any just cause".  The entry of the Judgment and subsequent filing of the Chapter 11 Cases created serious and legitimate concerns among the IRB Commissioners regarding the Debtors' ability to maintain normal operations during the Chapter 11 Cases, and remain current on operating obligations owing to all racing participants, including the Horsemen,

veterinarians, exercise persons, blacksmiths, agents and others providing goods and services to the Tracks.

To preserve the Debtors' licenses and help maintain the Debtors' continued viability while meaningful solutions to the creditors' claims against the Debtors were formulated and pursued, Movant was intimately involved in maintaining seamless communications between the IRB and the Debtors.

     2.    **Stakes Motion.**  Horse racing venues such as the Tracks traditionally hold several "stakes" races where, in addition to the Purse paid to owners and other Horsemen, additional funds are wagered and paid in advance by horse owners. Stakes races are considered to be the most important and lucrative events in horse racing, both nationally and in Illinois.  Their higher purses and greater visibility within the industry attract greater competition and ultimately garners a heightened level of interest of wagering customers.

The IRB, and the horse owners, were concerned that stakes payments anticipated to be paid by horse owners to the Debtors during the pendency of these Chapter 11 Cases could be at risk. The IRB asked the Debtors to address these matters at its January 2015 monthly meeting. To allay the IRB's and horse owners' concerns, Movant worked closely with the IHHA and the Debtors and ultimately prepared and filed a motion [Docket No. 129] (the "**Stakes Motion**") to ensure that the stakes payments made by horse owners were protected postpetition and held in trust in accordance with the Debtors' ordinary business practice and consistent with the terms of the IHHA contract.

As part of its efforts to prepare the lengthy Stakes Motion, Movant had to work with the Debtors' race coordinator to learn the history and common practices related to stakes races in the industry, and further needed to understand the statutory and regulatory framework that is

involved therewith. Based thereon, Movant researched and analyzed the legal arguments

available to support treatment of the stakes payments as trust funds, both under the Code and

state law, which were an essential part of the relief the IHHA requested and the reassurance

required by the horse owners and the IRB. Movant further negotiated new proposed procedures

with the IHHA and the Debtors to ensure that the horse owners would have the appropriate level

of confidence to continue to contribute to stakes races during the Chapter 11 Cases. This

procedure and the related relief sought in the Stakes Motion were critical to obtain so that the

Debtors could continue their 2015 racing season. The IRB, the IHHA and the Debtors were

informed that because of the ongoing Chapter 11 Cases, various horse owners were hesitant to

make stakes payments to the Debtors for the 2015 racing season. Pursuant to the Stakes Motion,

Movant successfully obtained the Court's authorization to continue to treat stakes as non-estate

property held by the Debtors in trust for the benefit of the horse owners, and established a

procedure for the administration and payment of stakes in accordance with the IHHA contract

and the Debtors' pre-bankruptcy practices. The motion also established a new procedure to

govern the treatment of the stakes accounts and future stakes races to be implemented in the

event the Chapter 11 Cases took an unexpected turn. As a result, the concerns raised by the IRB,

IHHA and the horse owners were fully addressed. Accordingly, stakes races continued in the

Chapter 11 Cases during the Operational Period as previously conducted by the Debtors.

    **3.**    **Settlement Acceleration Motion.**    An issue arose at the January 2015 IRB

meeting when representatives of Hawthorne and Arlington expressed their concern over the

timing of "settlement payments" between them and the Debtors and their affiliate, Coast To

Coast. Coast To Coast had two divisions, each of which provided separate services to the

Debtors. The food and beverage division provided food and beverage items to the Tracks and

each of their OTBs (9 in total). The other division, known as Illinois OTB (**"Illinois OTB"**),

operated the Debtors' OTB locations, providing personnel and leasing most of the locations

where it operated the OTBs.  The ability to simulcast live racing at other tracks throughout the

state of Illinois and the U.S. generates fees being paid between the various operators. For

example, the Debtors and the Debtors' OTBs were licensed to broadcast live racing at

Hawthorne, and in turn, paid a fee to Hawthorne. Likewise, Hawthorne and its OTBs were

licensed to broadcast live racing at Maywood and Balmoral, and in turn, paid fees to the Debtors.

Under the IRB's regulations, Maywood and Balmoral had "host" status for live out of state

evening races broadcast at Hawthorne and Arlington. Hawthorne and Arlington are awarded

"host" status during their respective racing season for live out of state races broadcast during the

daytime hours.

The end result of all of this is a process known as "settlement" where each of the tracks

remits the various fees owing the other tracks for host fees, simulcast importing fees and so on.

There is a constant flow of monies going to and from each of the tracks from all of the other in

state and out of state tracks. Insofar as Coast To Coast operated the Debtors' OTBs, collected the

wagers, paid out the winning bets, incurred and paid operating expenses to vendors and other

providers, the Debtors' "settlement payments" were effectively made by Coast To Coast. Under

an operating agreement between the Debtors and Coast To Coast, the Debtors were obligated to

fund any operating shortfall Coast To Coast might sustain from its Illinois OTB division.  As a

result of the difference in host fees due among the Illinois Tracks and declining revenues

throughout Illinois' horseracing industry, both at the Tracks and the OTBs, the Debtors were

contractually required to reimburse Coast To Coast in 2014 (and anticipated funding shortfalls

for 2015) to ensure it was able to fully and timely remit all "settlement payments" to in state and

out of state tracks.

The "settlement process" under the IRB 2015 "Race Dates Order"[8] is described in

paragraph 55, which states:

> Each licensee shall make pari-mutuel settlements within a 15-day cycle. Pari-
> mutuel settlements, include, but are not limited to, live and host track
> commissions, purse allocations, outstanding pari-mutuel winnings, surcharges and
> interstate host fees.

Significant sums of money are involved in this process. For example, for each weekly period, the

total amount of disbursements made by the Debtors, in the aggregate, to Hawthorne and

Arlington, ranged between approximately $250,000 - $300,000.

Paragraph 56 of the IRB 2015 "Race Dates Order" provides as follows:

> The failure of any organization licensee to satisfy any of the aforementioned
> conditions or mandates to the Board's satisfaction may result in civil penalties
> being assessed against them, rescission of their racing dates, and revocation of
> their organization licenses.

Since in or around 2006, the common practice between the Debtors, Hawthorne and

Arlington had been to make each settlement payment within around 2 weeks after the end of the

prior 15-day cycle. For example, the settlement payment for January 1 - 15 would generally be

made on February 2nd or 3rd.  January 16 - 31 would be paid around February 18th. This

practice allowed all of the Illinois Tracks to collect fees due them from out of state tracks during

the following two-week period and use those collections, in part, to make the necessary

settlement payment to the other Illinois Tracks. This assisted each of the Tracks' cash flow.

Because of the uncertainty surrounding any Chapter 11 case, Hawthorne and Arlington

expressed concern that each could effectively be owed one month's worth of fees from Coast To

---

[8] The 2015 "Race Dates Order" entered by the IRB on 10/14/14 is a 42-page official document granting organizational and related operating licenses to all Illinois horse tracks, including their allotted OTBs, and specifying how many days during the year and when, each of the tracks may conduct live racing.

Coast only to find that it, for whatever reason, as a company affiliated with the Debtors, could

not make the required settlement payments to Hawthorne and Arlington. The total amount "at

risk" could be approximately $600,000.  Although the Debtors did not agree there was any

meaningful risk to Hawthorne or Arlington, the IRB was sensitive to Hawthorne's and

Arlington's concerns, as the IRB was also fully cognizant of the cash pressures on those tracks

given the industry's economic woes. It was bad enough from the IRB's standpoint that the

Debtors faced the risks associated with bankruptcy, let alone expose Hawthorne and Arlington to

any fallout from the Chapter 11 Cases that could adversely impact their finances. In an effort to

address the IRB's concerns and recognizing the complete control the IRB has over all of the

Illinois Tracks, the Debtors expressed a willingness to reach some compromise with Hawthorne

and Arlington where the settlement process, for all of them would be accelerated.[9]

Negotiations between the Debtors, Hawthorne and Arlington continued unsuccessfully

throughout the end of January 2015 and continuing to the IRB's monthly meeting on March 17,

2015 (the February meeting was cancelled due to the Governor making new appointments to the

IRB, which were not finalized by the time of the scheduled February meeting).

At the March 17, 2015 IRB meeting, the issue of accelerating the settlement payments

was addressed by counsel to the IRB who recommended the IRB approve an accelerated process

whereby settlement payments would be made bi-weekly (for that bi-weekly period).

Representatives of Hawthorne and Arlington objected still pushing for a 48-hour settlement

process. The newly appointed IRB Chairman pointed out that paragraph 55 of the Race Dates

Order actually did not provide the tracks with an *additional 15 day period* in which to remit

settlement payments. Rather, it states all settlement payments "shall" be made "within a 15-day

---

[9] Hawthorne and Arlington would likewise be required to remit their respective settlement payments to the Debtors on the same accelerated basis used by the Debtors to remit payment to those other tracks.

cycle." Just because all Illinois Tracks had unilaterally decided to give each other an *additional* 15 day period to make settlement payments did not modify the requirements of the Race Dates Order. After much discussion, the IRB approved a compromise where instead of a 48-hour settlement or bi-weekly settlement, the Illinois Tracks would be required to make *weekly* settlement payments. Movant advised the IRB that such change would require Bankruptcy Court approval, and that Movant could not predict the position of the Judgment Creditors to any such motion, or the Court's ruling on same. However, in deference to their regulatory and governing body, the Debtors agreed to seek the Court's approval.

Movant expended significant efforts to assist the Debtors throughout this process prior to the drafting the **"Settlement Acceleration Motion"** [Docket No. 147], and filed and first presented on April 14, 2015. As part of the motion, Movant sought Court approval for the Debtors to implement the new settlement process and to advance Coast To Coast the funds necessary to cover an anticipated cash shortfall that would be generated by the concomitant reduction of the settlement period. The Court continued the hearing on the motion to afford the Judgment Creditors time to file a response. They filed a formal response objecting to the Settlement Acceleration Motion, arguing, among other things, that there was no statutory basis for the requested relief and challenging the basis to fund the shortfall to Coast To Coast. Due to the sensitive nature of the financial information placed at issue in the Judgment Creditors' objection, this formal response was not publicly filed. On April 28, 2015, the Judgment Creditors filed their objection under seal pursuant to an oral motion and order entered at hearing on April 28, 201 5 [Docket No. 173]. The Court continued the hearing on several occasions to allow for both oral and formal written argument [see Docket Nos. 149, 173 and 193].

Prior to and after filing the motion, the Movant engaged in numerous discussions with the

Debtors, IRB and the Judgment Creditors' Counsel to fully understand the settlement process

and the measures necessary to implement the changes mandated by the IRB.   These discussions

included production of documents and financial information to the Judgment Creditors regarding

the Debtors' contractual and operational business relationship with Coast To Coast, and an

informal deposition of Randall Olech (the Debtors' COO/CFO) by the Judgment Creditors.  The

Movant also filed a formal reply on May 8, 2016, also under seal, in response to the Judgment

Creditors' objection.  After hearing additional argument on May 12, 2015, the Court continued

the hearing for further argument on May 14, 2015.  During this time Movant was able complete

negotiations of an agreed resolution of the Settlement Acceleration Motion and the objection.

Pursuant to the settlement, the Court approved the Debtors' compliance with IRB's revised

settlement procedure and authorized an advance to Coast To Coast as requested by the Debtors,

pursuant to specific procedures detailed in the resulting Agreed Order entered on May 20, 2015

[Docket No. 202].

**4.**   **Race Dates Reduction Motion.**  Harness racing at the Tracks was operated year-

round in the evening.  Since 1998, the Debtors operated a coordinated race and Purse schedule

for the benefit of their Horsemen, and approved by the IRB. For the last two decades the Illinois

Tracks have faced increased hurdles to profitable operations, including the proliferation of

riverboat gambling casinos in Illinois.  Over the course of the past decade all Illinois Tracks

reduced the amount of races run in an effort to bolster their profitability.  When the tracks run

fewer races and compress race dates they can boost the average daily Purses.  Also, certain times

of the year and certain days of the week do not, generally speaking, produce sufficient betting

Handle and Purses sufficient to justify the related costs of operation.

Starting in 2006, the Debtors requested that the IRB vacate their Monday race dates as it represented the least profitable day for races. Over the course of the next several years the Debtors successfully petitioned the IRB to drop race dates that occurred on Tuesdays, and then Wednesdays, the least profitable days of racing after Mondays. Consistent with these historic practices, in their 2015 race dates application (submitted in July 2014 and presented to the IRB in September 2014), the Debtors requested: (a) only four race dates for the first half of 2015 (Maywood racing on Thursdays and Fridays; Balmoral racing on Saturday and Sunday); and (b) the reduction to two race dates for the second half of 2015, thereby racing only at Balmoral for July 1 through December 31, 2015.

At the September 2014 IRB dates hearing for 2015 races, the IRB denied the request to reduce the Debtors' race dates after June 30, 2015. The IRB did, however, communicate to the Debtors at the dates hearing that they could request vacating Maywood's two race dates during the last half of 2015, at which point the IRB would consider the circumstances that existed at that time. In advance of the August 27, 2015 IRB meeting (the "**August Meeting**"), the Debtors requested that the IRB again consider its approval to vacate live racing at Maywood on Thursdays and Fridays beginning October 1, 2015; and Balmoral's request to move live racing on Sundays to Fridays starting October 2, 2015 (collectively, the "**Reduction Request**"). At the August Meeting, the IRB approved the Reduction Request, while Movant advised that approval of this Court would also be required. To obtain such approval and implement this important change in the Tracks' operations, on September 3, 2015, Movant filed a motion to reduce and modify their race dates consistent with the Reduction Request approved by the IRB [Docket No. 297] (the "**Race Dates Reduction Motion**"].

The IHHA objected to the Reduction Request and to the Race Dates Reduction Motion. During this time, the Tracks and the IHHA also engaged in negotiations regarding a possible extension of the IHHA contract, which was set to expire on October 4, 2015.  Movant engaged in discussions with IHHA's counsel regarding both matters, attempting to find a consensual resolution.  To that end, Movant also advised the Judgment Creditors of the Reduction Request, why the Debtors' believed such reduction of race dates to be necessary and in the best interests of all creditors, and to obtain support therefor.  As part of that effort Movant drafted a lengthy and detailed correspondence to Judgment Creditors' Counsel (dated August 21, 2015), which provided further information to support the Reduction Request, and which included reduced costs, increased profitability of races actually run, and a reduction of amounts loaned to the IHHA.  Movant also clearly established that the Reduction Request was in the best interests of all creditors and appropriate relief under Section 363 of the Code.  This correspondence served as the template to the Race Dates Reduction Motion.  Due in part to Movant's effort, the Judgment Creditors did not object to the relief requested in the Race Dates Reduction Motion.

The IHHA, however, sought time to file a formal objection to the Race Dates Reduction Motion as it also pursued an appeal of a technical voting issue under the Illinois Open Meetings Act in connection with the August Meeting at which the IRB voted to approve the Reduction Request.  At the September 8, 2015 hearing on the Race Dates Reduction Motion, Movant successfully petitioned the Court for an accelerated briefing schedule to facilitate a ruling in advance of the October commencement of the reduced racing schedule at the Tracks.

On September 18, 2015, IHHA filed a formal response objecting to the Race Dates Reduction Motion [Docket No. 306], thereby necessitating a reply brief.  Movant drafted and filed a formal reply brief in support of the Race Dates Reduction Motion [Docket No. 313],

rebutting the IHHA's arguments and affirming that the requested relief was part of the Debtors'

ordinary course of operations and/or was a sound exercise of business judgment consistent with

the requirements of Section 363 of the Code. Throughout this process, Movant also

communicated regularly with IRB's general counsel and counsel for the IHHA in an effort to

reach a resolution to the dispute. The Court heard argument on September 22, 2015, and

continued the hearing to September 24, 2015 to allow the parties more time to resolve the matter.

Ultimately, the Debtors and Movant secured a withdrawal of the IHHA objection, and agreed to

allow the IHHA limited use of the Maywood track after ceasing racing operations and to

maintain dormitory housing for the affected Horsemen through November 21, 2016.  On

September 24, 2015, the Court entered an order approving the relief sought in the Race Dates

Reduction Motion [Docket No. 319].

     **5.**     **IRB Race Dates Rejection.**  The IRB has jurisdiction and power over every

person who holds or conducts any race meeting within the State of Illinois.  It regulates and

controls the procedures for all aspects of the racing and wagering process involved in the

Debtors' business operations.  As part of the process of allocating yearly racing dates, the IRB

issues an Annual Dates Order after an annual hearing.  On July 31, 2015, the Debtors filed with

the IRB an application for race dates in 2016.  The IRB's annual race dates hearing was

scheduled for September 29, 2016 (**"Race Dates Hearing"**).

     As the linchpin to RCO's marketing efforts was the potential that the Tracks could

become Racinos. To retain that possibility, it was necessary that the IRB grant the Debtors'

annual live racing application for 2016 dates and related issuance of 2016 organizational and

OTB licenses. These licenses were effectively absolute requirements for RCO's efforts to market

the Debtors' businesses as going concerns.

The Debtors' principals and management were confident that the IRB would grant all or most of the Debtors' 2016 race dates application. The Debtors represented 50% of the northern Illinois Tracks, employed many people, generated tax revenues, generated revenues for many vendors and the surrounding communities, and had a direct impact on the many related agri-businesses involved. However, prior to the Race Dates Hearing, Arlington and Hawthorne, the Debtors' only competitors, entered into an agreement to effectively put the Debtors out of business by having Hawthorne request harness racing dates for the first time in decades. Having Arlington and Hawthorne, two fierce competitors who often contested each other's annual race dates applications, join forces was a relatively unique occurrence. Nonetheless, the Debtors believed that a majority of the IRB commissioners would award the Debtors 2016 live racing dates, especially given the prospects of a Section 363 sale to a financially strong purchaser.

During the morning portion of the September 29th hearing, Movant and members of the Debtors' management gave an extensive presentation in support of the Debtors' application. It was reported that RCO's efforts had begun in earnest only a month or so before and were progressing in a promising manner. An auction under the Code was likely to occur before the end of the year, and accordingly, all parties would know where matters stood by that time. The uncertainties of the Chapter 11 Cases as to the operation of Balmoral and Maywood could be resolved positively. A new owner acquiring either or both of the Debtors' facilities would be doing so in anticipation of Illinois gaming legislation ultimately being passed, even if still a year or two or more away. That was not an unusual risk for large and very wealthy gaming operators to accept. The expected investment an operator would make in the facilities to accommodate gaming would be enormous (*e.g.* over $100,000,000) and greatly inure to the benefit of the state, county and local municipalities, the surrounding communities, the Illinois horse racing industry

and related agriculture businesses in their entirety. Arlington and Hawthorne representatives presented their arguments in support of their arrangement. The IHHA representatives unexpectedly supported their arrangement. Movant was given the opportunity to, and did, give a closing argument. The IRB broke for deliberations. Many parties in attendance told Movant and the Debtors' that their presentation was very persuasive and expected the Debtors to get their 2016 live racing dates.

Despite the high degree of confidence that the Debtors would receive live 2016 race dates, the IRB voted unanimously to reject the Debtors' applications, no doubt due to the unanticipated Arlington-Hawthorne agreement and the IHHA's unexpected support of same. The IRB's decision came as a total shock to the Debtors' principals and management who had spent their entire careers in the horse racing industry and thought they had seen it all. The Debtors had no effective recourse to the IRB's decision under the circumstances.

## C. EXECUTORY CONTRACT MATTERS

**SERVICES RENDERED:**

| ATTORNEY | HOURS | RATE | VALUE |
|----------|-------|------|-------|
| AFB | 30.80 | $325.00 /hr | $10,010.00 |
| ESB | 47.30 | $395.00 /hr | $18,683.50 |
| NRD | 1.70 | $150.00 /hr | $255.00 |
| CHG | 32.00 | $525.00 /hr | $16,800.00 |
| NQR | 122.80 | $435.00 /hr | $53,418.00 |
| **TOTAL** | **234.60** | | **$99,166.50** |

Movant expended approximately 234.60 hours (see Group Exhibits C(1) - C(18) attached hereto) during these Chapter 11 Cases in matters primarily involving the Debtors' critical executory contracts and unexpired leases.

As mentioned above, and as more fully set forth on the Schedule G's to each of the Debtors' Schedules on file herein, the Debtors were collectively parties to approximately 268 executory contracts and unexpired leases. Movant's efforts in this category during these Chapter 11 Cases focused on four (4) critical sets of the Debtors' executory contracts and unexpired leases:

i.    **Simulcast Contracts.**  Approximately 80 different contracts covering importing and exporting simulcast agreements between the Debtors and the owners of approximately 300 different racetrack and OTB locations throughout the country;

ii.   **IHHA Contract.**  The agreement with the Illinois Harness Horsemen's Association which governed the business relationships between the Debtors and the hundreds of Horsemen who were the persons and entities who owned, trained, bred and raced the horses at the Tracks, among other things;

iii.  **Maywood Real Estate Leases.**  The real estate leases, and related agreements covering the 75-acre parcel which included Maywood Park, Harlem Irving Plaza, and related facilities; and

iv.   **Coast To Coast Operating Agreement and Subleases.**    The various agreements with the Debtors' affiliate pursuant to which the Debtors operated all their nine (9) OTBs.

-------------------------------------------------------------------

1.    **Simulcast Contracts; Setoff/Recoupment Analysis.**  As part of preparing the Schedules and understanding a critical portion of the Debtors' operations and revenue sources, Movant examined the Debtors' numerous contracts for simulcast wagering for both the import and export of a broadcast signals of horse races across the country and internationally

67

(collectively, the "**Simulcast Contracts**"[10]). These arrangements provided a substantial portion

of the Debtors' total annual revenues. Import Simulcast Contracts cover live racing at a third

party. Export simulcast contracts cover third-party racetracks and OTBs which received a

broadcast of the Debtors' live racing.  The Simulcast Contracts are complex insofar as they

address myriad configurations of transactions covering obligations flowing back and forth for

live and host track commissions, purse allocations, outstanding pari-mutuel winnings, surcharges

and other fees, some of which are governed by statute and others by contract.

     Non-debtor counterparties to the Simulcast Contracts are often referred to and

contractually defined as a "Host" or a "Guest."  There may be dozens of such counterparties to

any one Simulcast Contract.  Multiple Hosts or Guests may agree in a Simulcast Contract that

one party will serve as their agent for purposes of settling payments and other obligations under

the contract.  Accordingly, while the Debtors may have settled payments due to and due from

approximately 80 agents under the Simulcast Contracts (each listed on Schedule G filed by each

of the Debtors), there were hundreds of Hosts and Guests that are parties to the contracts;

Movant determined that each party could have a claim under the Code and thus included all such

parties on Schedule F filed by the Debtors.  The business relationships among the Debtors and

the simulcast parties (and similar relationships among the Debtors and the other horse racing

tracks in Illinois), gave rise to accounts payable and accounts receivable that were settled

between the parties on a weekly, monthly or even longer basis.  As a result, as of the Petition

Date, such parties had claims against the Debtors and also owed accounts payable to the Debtors.

     At the commencement of the Chapter 11 Cases, and as evidenced by the Debtors'

Schedules B-16 (Accounts Receivable) and Schedule F (Unsecured Non-Priority Claims), there

---

[10]  The in-state races equivalent of out-of-state race simulcast contracts are called "intertracks" under IRB rules and regulations and the Horse Racing Act. For simplicity hereof, all such arrangements are called Simulcast Contracts.

were monies due from, and due to, virtually all of the 80 agents under Simulcast Contracts.

Understandably, many of the Simulcast Contracts counterparties (and in-state tracks) were

concerned that the Debtors would be able to seek the payment of amounts owing them from the

other track locators while being able to use the automatic stay in the Chapter 11 Cases to avoid

paying prepetition claims.  A number of these parties contacted Movant to discuss possible

resolutions to these potential issues.

To that end, Movant needed to analyze the issues of setoff and recoupment as the

cessation of the customary cash intake of accounts receivable could have an impact on

continuing operations despite the offsetting prohibition of paying prepetition claims.  Movant

examined the elements and formulation of setoff and recoupment under the applicable provisions

of the Code. Substantively, these rights are formulated in different ways. To properly analyze

these issues, Movant researched the factors under which Section 553(a) of the Code preserves a

creditor's rights of setoff.  Setoff issues required to be examined included the mutuality of the

debts; triangular setoffs and identities of the parties where parent and subsidiary companies, and

other affiliated parties, are involved; possible fiduciary capacity of the parties in question; setoff

of joint debt against separate debts; character of the obligations; substantive consolidation impact

on mutuality requirements; validity and enforceability of valid setoff rights; treatment of claim as

secured claim due to bifurcation of claims; equitable considerations; timing of setoff efforts;

Illinois law on setoff issues; and distinguishing lien and setoff rights, were all examined as to the

applicability to the instant situations.

So too was the concept of recoupment, a court-made exception to the mutuality

requirement under Section 553(a), which Movant had to review and analyze to determine its

applicability to the Chapter 11 Cases. In this area, issues researched included the existence of

independent obligations versus claims arising only out of the same transaction or occurrence; means of raising recoupment in that it is not an independent claim and can only be asserted as a counterclaim; the effect of multiple transactions requiring the resolution of one to address others; the inapplicability of a single contract satisfying the necessary requirements; and enforceability of the automatic stay.

Throughout the Chapter 11 Cases, there was no need for a determination of any global treatment of the "netting" of Simulcast Contract obligations to be made given the need for the Debtors' and Movant's focus to have been put on the numerous other matters existing in the Chapter 11 Cases which took precedence.  Moreover, to complicate the matter, some of the parties to Simulcast Contracts asserted a theory that certain funds held by the Debtors constituted trust funds that were not property of the estates and should (as they argue) be used to pay certain prepetition claims.  No party filed a motion bringing these issues to the forefront, but nonetheless, Movant was required to examine these issues in order to understand the possible ramifications of each and advise the Debtors of the implications of alternative resolutions.

     **2.**    **<u>Illinois Harness Horsemen's Association Contract.</u>**  The Debtors were parties to that certain "2014-June 30, 2015 Agreement" dated March 14, 2014 with the IHHA (the "**IHHA Agreement**").  The IHHA represents a majority of the Horsemen, which as stated consist of the individuals and entities who owned, trained, and raced the horses at the Debtors' Tracks, among other things. The Horsemen include the hundreds of horse owners, harness drivers, trainers, breeders, and grooms.  The IHHA Agreement governed the business relationship between the Debtors and the Horsemen. Simply put, the Debtors could <u>not</u> operate their businesses without an IHHA Agreement in effect.  Representatives of the IHHA are key participants at each of the IRB monthly meetings.

At the Petition Date, the then current IHHA Agreement followed lengthy negotiations between the Debtors and the IHHA which delayed the start of the 2014 harness racing season. The primary issue was the calculation and treatment of Purses paid, which had been impacted by the loss of live Handle (wages placed on live races run at the Tracks) caused by the simulcasting of live races at other tracks[11]. Pursuant to Section 26(g)(13) of the Horse Racing Act, qualified licensed Illinois wagering facilities (which included the Debtors), were permitted to deduct an amount equal to 2% of the difference between the wagering facility's 1994 handle on Illinois races and its handle on Illinois races in the year in question, from amounts allocated or payable to purses in the succeeding year, at the racetrack from which the wagering facility is affiliated. Negotiations concerning overpayment of purse balances resulted in the IHHA Agreement, which had a term of 18 months, expiring June 30, 2015.

As previously mentioned, under the Horse Racing Act, race licensees such as the Debtors, who collected the bets and conducted the races, split a portion of all bets with the Horsemen. The total amount of all bets placed on a race, called the Handle, is allocated to the Horsemen and referred to as the Purse. Certain of the funds used to pay the Horsemen are maintained by a licensee in a segregated Purse account (**"Purse Account"**). While each of the horse racing tracks in Illinois consider funds deposited into their respective Purse Accounts to be held in trust, the legal issues surrounding the Purse Accounts is complex. The IRB and the IHHA also consider the monies in the Purse Accounts to be held in trust for the benefit of the Horsemen.

Consistent with the past practices of the parties and throughout the horse racing industry in Illinois, the Debtors identified the segregated Purse Accounts in the Schedules as property being held for the benefit of the Horsemen. Still, without the clear language in the IHHA

---

[11] Simulcasting of live races was first authorized in Illinois in 1995.

Agreement addressing any trust fund aspect of the Purse Account, Movant was required to analyze this issue as it was acutely important to the IHHA and the IRB.

To that end, Movant examined the IHHA Agreement, the applicable provisions of the Horse Racing Act, and applicable case law describing the Illinois doctrines on the creation of trusts and the treatment of Purse Accounts under the Horse Racing Act. Issues, documents and law researched, analyzed and examined included: Illinois trust law; contract construction; and the IHHA Agreement provisions covering the Purse Account, including distinctions between the Debtors' other funds; designations of purpose; limitations on use of funds; and reversion rights. No further action was required of Movant, but not before Movant was required to respond to questions raised by the IRB concerning Purse Account monies, determine support for the Debtors' descriptions of such funds in their Schedules and SOFA, and advise the Debtors of the implications of the pertinent questions.

Throughout the Chapter 11 Cases, the extension of the IHHA Agreement was a topic of discussion among Movant, the Debtors and counsel for the IHHA. Given the prepetition overpayment of the Purse Account for the benefit of the Horsemen represented by the IHHA, Movant examined and worked with Debtors to determine how, it at all, such funds could be collected by means other than the collective repayment by the Horsemen pursuant to terms of the IHHA Agreement. This presented a difficult problem for the Debtors as their racing future became unclear as it was also unclear how to collect such amounts. Thus the maintenance of the status quo, *i.e.*, repayment by the Horsemen through contractually-agreed amounts through the IHHA Agreement, remained critical. To that end Movant worked with Debtors and the IHHA to ensure that some form of the IHHA Agreement remained in place throughout the six-month period between the expiration of the existing agreement (June 30, 2015) and the cessation of

racing (December 31, 2015). Ultimately, with Movant's assistance, the Debtors obtained two

separate three-month extensions of the IHHA Agreement, that continued its effectiveness

through and including December 31, 2015.

### 3.  **Maywood Park Real Estate Leases**

Since its formation in 1946, Maywood never owned the real property at Maywood Park.

For decades, Maywood ran its races and otherwise maintained its principal place of business at

Maywood Park which was located at 8600 West North Avenue, Melrose Park, Illinois

(**"Maywood Realty"**).

The Maywood Realty is owned by three land trusts for the benefit of descendants of

descendants of Arthur T. Galt, Sr., (1) that Trust Agreement known as the Arthur T. Galt Jr.

Trust dated February 16, 1967, (2) that Trust Agreement known as the Raymond M. Galt Jr.

Trust dated February 16, 1967, and (3) that Trust Agreement known as the William C. Galt Trust

dated February 16, 1967 (collectively, the **"Galt Trusts"**). The Maywood Realty consists of

approximately 75 acres. Maywood leased the Maywood Realty from the Galt Trusts under <u>at

least thirty (30) individual lease agreements, amendments and other related substantive

documents</u>. Movant was required to analyze numerous and complex lease agreements,

amendments, terminations, renewals, exhibits and related documents to determine the specific

nature and terms of the various leases that comprised one of Maywood's more valuable assets,

which are summarized herein.

Maywood's lease of the Maywood Realty originated out of that certain Lease Agreement

dated March 26, 1979 between the Galt Trusts, as lessor, and Maywood, as lessee, which

agreement was subsequently modified by amendments dated January 25, 1985 and October 2,

1987 (collectively, and together with any exhibits, memoranda and further amendments thereto,

the "**Maywood Original Lease**"). Given the decline in horse racing attendance over the years,

Maywood eventually sought to reduce that portion of the Maywood Realty used for its harness

racing business. In the mid-1980s, Maywood's management began to explore the possible

development of a parcel of the Maywood Realty. In connection therewith, and as a modification

to the Maywood Original Lease, the Debtor executed that certain Agreement of Leases dated

October 2, 1987 with the Galt Trusts (together with any exhibits, memoranda and amendments

thereto, the "**Maywood Development Lease**"). The Maywood Development Lease modified the

Maywood Original Lease by permitting Maywood to develop for commercial sublease 25 acres

of the Maywood Realty originally used as part of Maywood Park's parking areas (the

"**Commercial Parcel**"), with the other 50 acres still designated for harness racing operations and

parking (the "**Maywood Track Parcel**").

Maywood's efforts to develop a portion of the Maywood Realty for commercial uses

culminated in the execution of certain agreements governing the leasing and subleasing of the

Commercial Parcel. Maywood, either directly or through its "Maywood Land Trust"[12], executed

the following agreements with the Galt Trusts:

> (a) Commercial Lease Agreement dated as of March 30, 1992 between the Galt
>
> Trusts and the Maywood Land Trust, as amended by First Amendment dated
>
> September 29, 1992, and Second Amendment dated March 25, 1993 (together
>
> with any exhibits, memoranda and further amendments thereto, and that certain
>
> easement agreement dated March 30, 1992, the "**Commercial Lease**"). The
>
> Commercial Lease replaced the Maywood Original Lease with respect to the Galt
>
> Trusts' lease of the Commercial Parcel to Maywood.

---

[12] The "**Maywood Land Trust**" was that certain land trust with JPMorgan Chase Bank, N.A., successor to American National Bank and Trust Company of Chicago under Trust Agreement dated January 1, 1992 a/k/a Trust No. 115047-01, of which Maywood was the 100% beneficial interest holder.

    **(b)** Also in connection with the development and sublease of the Commercial Parcel, and concurrent with execution of the Commercial Lease, the Maywood Land Trust executed that certain Commercial Sublease Agreement dated March 30, 1992 (the "**Maywood Primary Sublease**") with a land trust in which The Harlem Irving Companies, Inc., an Illinois corporation ("**Harlem Irving**"), was the 100% beneficial interest holder.  As the Maywood Land Trust was the sublessor, not sublessee, under the Maywood Primary Sublease, it was not subject to the restrictions under Section 365(d)(4) of the Code and, therefore, not the subject of the relief the various extension motions described below, except to the extent its rights thereunder were derivative of the Commercial Lease.

    **(c)** Partial Termination of Lease Agreement dated March 30, 1992 between the Galt Trusts and Maywood (together with any exhibits, memoranda and amendments thereto, the "**Partial Termination**", and together with the Maywood Original Lease and Maywood Development Lease, the "**Maywood Primary Lease**"). In connection with execution of the Commercial Lease, the Partial Termination modified the Maywood Original Lease to apply only to the Maywood Track Parcel.

As of the Petition Date, the Maywood Primary Lease continued to govern the Maywood's use of the Maywood Track Parcel.  The Maywood Primary Lease had an initial term through December 31, 2008 and a 20-year renewal option through December 31, 2028. This renewal option had been timely exercised, and accordingly, at the commencement of the Chapter 11 Cases, the Maywood Primary Lease had approximately fourteen (14) years remaining on its term.

As of the Petition Date, the Commercial Lease continued to govern the Maywood's use of the Commercial Parcel.  The Commercial Lease had an initial term through March 29, 2012, with three renewal options, which,  if all exercised, would extend the lease through December 31, 2028. All three renewal options had been timely exercised, and accordingly, at the commencement of the Chapter 11 Cases, the Commercial Lease had approximately fourteen (14) years remaining on its term.

Maywood's total lease payment to the Galt Trusts under the Maywood Primary Lease and the Commercial Lease (collectively, the "**Maywood Leases**") included (a) a formula based on various data and conditions as set forth in detail in the Maywood Primary Lease, and (b) a formula set forth in the Commercial Lease, essentially comprised of one-sixth of the yearly sublease payments Maywood received under the Maywood Primary Sublease.  In total, and consistent with lease payments in the years leading up to the Petition Date, the total lease payments for the entire 75 acres under the Maywood Leases for year 2015 were approximately $750,000.  This total rent payment was made up of two parts, (y) approximately $645,000 due under the Maywood Primary Lease, and (z) an additional amount of approximately $105,000 due as a result of the income generated under the Commercial Lease (*i.e.,* sublease payments from the tenants under the Maywood Primary Sublease).

### i.        Extension of 365(d)(4) Deadline

Section 365(d)(4)(A) of the Code provides that "an unexpired lease of nonresidential real property under which the debtor is the lessee shall be deemed rejected, and the trustee shall immediately surrender that nonresidential real property to the lessor, if the trustee does not assume or reject the unexpired lease by the earlier of – (i) the date that is 120 days after the date of the order for relief; or (ii) the date of the entry of an order confirming a plan."  11 U.S.C. §

365(d)(4)(A). The Court, however, is permitted to "extend the period determined under

subparagraph (A), prior to the expiration of the 120-day period, for 90 days on the motion of the

trustee or lessor for cause." 11 U.S.C. § 365(d)(4)(B).

Because the order for relief was entered in the Chapter 11 Cases on December 24, 2014,

the last day of the initial 120-day period provided by Section 365(d)(4) was April 23, 2015.

Since Maywood operated its principal business at the race track located on the Maywood Track

Parcel, and further enjoyed significant financial benefits from its sublease of the Commercial

Parcel, it was critical for the Debtors to maintain the ability to assume (and possibly assign) that

Maywood Leases while it operated and explored potential going concern and other sales.

Further, if the Maywood Leases were deemed rejected by operation of Section 365(d), the

Debtors would be required to surrender possession of the Maywood Realty and Maywood would

be forced to stop racing in the midst of the 2015 season and the Chapter 11 Cases, thereby

rendering any efforts to reorganize impossible. At the same time, without a buyer to assign the

Maywood Leases to, it was risky for the Debtors to assume the Maywood Leases given the

fourteen years remaining on the lease terms. The assumption of leases with 14-year remaining

terms would have had sizeable financial ramifications on Maywood and its estate.

In connection with Section 365(d)(4), the Movant drafted and filed a motion to continue

the deadline to assume or reject the Maywood Leases (the **Assumption/Rejection Deadline**")

on April 16, 2015 [Docket No. 151]. Movant was able to establish "cause" as required by

Section 365, and the Court entered an order granted the motion [Docket No. 163], thereby

extending the Assumption/Rejection Deadline through July 22, 2015. Because Maywood

already obtained an initial extension of 90 days, any further extension of the

Assumption/Rejection Deadline could be ordered "only upon the prior written consent of the

lessor," the Galt Trusts. 11 U.S.C. § 365(d)(4)(B). Given that the Debtors sale efforts were not yet formalized through a third party broker and that the Chapter 11 Cases were relatively young, Maywood required additional time to operate at the Maywood Track Parcel and to maintain the possibility of assuming and assigning the Maywood Leases. Movant thus prioritized negotiations with counsel for the Galt Trusts, which effectively had a veto power over any further extension. Citing to the ongoing operations and substantive efforts to find a buyer for the Tracks as a going concern, Movant successfully obtained the Galt Trusts' consent for a second extension of the Assumption/Rejection Deadline for an additional ninety (90) days with the continuing effectiveness of such extension conditioned on the following (collectively, the "**Tax Payments**"):

    a.    Payment of all Cook County 2014 real estate taxes on the Maywood Realty in full, plus any interest and late charges assessed on those taxes, which were Maywood's obligations under the Maywood Leases; and

    b.    On each of August 1, September 1, and October 1, 2015, payment to the Galt Trusts of $29,000.00 towards a 2015 property tax and expense escrow, which may be used to pay property taxes and/or legal fees of the Galt Trusts.

Again, a formal motion and order were required under the Code necessitating that Movant draft, file and present a second Section 365(d)(4) extension motion for the Galt Leases. The Court entered an order on July 21, 2015 [Docket No. 262], extending the Assumption/Rejection Deadline through and including October 19, 2015.

Throughout this second extension period, the Debtors and Movant continued to work with the court-appointed investment banker to market the Maywood Realty and other assets of the estates for sale. Based on the sale efforts during that time, the Maywood Realty was critical for sustaining the interest in a purchase by various potential bidders. Moreover, in connection with the Reduction Motion, Maywood previously committed to maintaining the racetrack and

backstretch located on the Maywood Track Parcel for the benefit of its Horsemen through

November 21, 2015.   Initially, per Maywood's request, Movant negotiated a thirty day extension

of the Assumption/Rejection Deadline, and drafted and filed a third extension motion on October

9, 2015.   In discussing the matter with Judgment Creditors' Counsel, and in light of the ongoing

sale efforts, after filing the motion Movants negotiated a longer extension with the Galt Trusts

through year-end 2015.   Accordingly, the Court eventually entered an agreed order on October

21, 2015 [Docket No. 334], extending the Assumption/Rejection Deadline through December 31,

2015, in exchange for two additional monthly Tax Payments, the reimbursement of legal fees

actually incurred by the Galt Trusts, and various provisions designed to assist the Galt Trusts in

evaluating the status of the Maywood Realty (*e.g.* title work and sewer diagrams).

Thereafter, the Galt Trusts informed the Debtors that they would not agree to any further

extension of the Assumption/Rejection Deadline.   As discussed in greater detail herein, during

the third extension period the Movants worked closely with the Debtors and their investment

banker to sell the Tracks as going concerns.   The Debtors did not obtain such a going concern

buyer for Maywood, but did secure a stalking horse offer to purchase the Debtor's rights in and

to the Commercial Lease (and to assume and assign same pursuant to 11 U.S.C. § 365).   Given

the status of the sale efforts at that time, Maywood believed that offer provided a substantial

benefit to the estate by monetizing an asset that would effectively cease to exist for the estate

after the Assumption/Rejection Deadline passed.   Movants thus negotiated with counsel for the

Galt Trusts and obtained a final agreed order extending the Assumption/Rejection Deadline

through January 8, 2016, thereby facilitating the sale of Maywood's rights under the Commercial

Lease. By operation of law the Maywood Primary Lease was deemed rejected effective as of

December 31, 2015.   Movant drafted and filed the necessary motion [Docket No. 380] for a

fourth extension on December 30, 2015. After Movant's presentment of the motion, the Court

entered an order granting the extension on January 5, 2016 [Docket No. 390]. Movant utilized

the extension to close the sale and assignment of the Commercial Lease.

**ii.      Payment of Real Estate Taxes**

Maywood stayed current with its postpetition obligations owed to the Galt Trusts under

the Maywood Leases with the exception of reimbursement for real estate taxes that were

assessed for 2014, but were neither payable nor billed until 2015 (*i.e.* post-petition), and thus

were not immediately payable post-petition applicable law in the Seventh Circuit. *See In re*

*Handy Andy Home Improvement Centers, Inc.*, 144 F.3d 1125 (7th Cir. 1998). As discussed

above, to obtain a second extension of the Assumption/Rejection Deadline, the Galt Trusts

required Maywood to make certain Tax Payments, which included the 2014 real estate taxes.

Movant worked with Maywood and the Judgment Creditors' Counsel to analyze the cost and

benefits of making the Maywood Tax Payments. Movant advised that it was in the best interests

of the Debtors' creditors and estates to make such payments to obtain the benefits of the

extending the Assumption/Rejection Deadline. Moreover, in the event that the Debtors assumed

and/or assigned the Maywood Leases as part of a plan organization or sale of their assets, such

tax obligations would have to be paid to cure the relevant default under the Maywood Leases

pursuant to 11 U.S.C. § 365(b).

Unlike Maywood, Balmoral owned Balmoral Park in Crete in fee simple.   Balmoral also

had easement and use rights related to sewage ponds on real property adjacent to the Balmoral

Property, pursuant that certain 1979 Easement Agreement (the **"Pond Property"**).   Balmoral

paid real estate taxes for the Pond Property under the Easement Agreement.

In the ordinary course of business and with respect to the operations at both Tracks, the

Debtors incurred real estate taxes and paid such taxes and fees to the applicable taxing

authorities (collectively, the **"Authorities"**). The real estate taxes were due and payable one year

in arrears of accrual, and paid in two installments.  Accordingly, the tax obligations of Balmoral

and Maywood (collectively, the **"Balmoral Tax Obligations"**) accrued throughout 2014 and

were assessed and payable in 2015 in two installments.  Any limitations of the Debtors' ability to

utilize the real property where their racetracks were located could have had a material adverse

impact on their ability to operate.

Further applicable state and local laws applicable in Will County, Illinois (where

Balmoral Park was located) and Cook County, Illinois (where Maywood Park was located), grant

the tax Authorities the power to charge late fees and interests, and to impose statutory liens on

their properties, if such taxes are not timely paid.  Accordingly, the Debtors typically paid the

real estate taxes timely in the ordinary course of business on a semi-annual basis to avoid the

imposition of unnecessary fines, interest charges, liens and related enforcement actions.

As part of preparing for the filing of the Chapter 11 Cases in exigent circumstances,

Movant advised Debtors of the benefits and burdens of filing for Chapter 11 relief, including the

prohibition against paying prepetition obligations. Nonetheless, Balmoral inadvertently paid the

first installment of the real estate taxes levied by Will County for Balmoral Park, and the Pond

Property.  In light of this and the fact that Maywood had an obligation to make the Tax

Payments, Movant's worked with the Debtors, the Galt Trusts and the Judgment Creditors to get support for the payment of the Tax Obligations.

Movant analyzed the Tax Obligations and advised the Debtors that the Balmoral Tax Obligations would be priority claims under Section 507(a)(8) of the Code. See 11 U.S.C. § 507(a)(8). Moreover, to the extent that such amounts were entitled to priority treatment under Section 507(a)(8), the relevant taxing Authorities could also attempt to assess interest and penalties. See 11 U.S.C. § 507(a)(8)(G) (granting priority status to "a penalty related to a claim of a kind specified in this paragraph and in compensation for actual pecuniary loss"). As priority claims, taxes and penalties had to be paid in full before the Debtors could obtain confirmation of a Chapter 11 plan or make distributions to general unsecured nonpriority creditors. 11 U.S.C. § 1129(a)(9)(C). Further, such payment is typically a seller's obligations and would have to be paid by Balmoral in any sale of Balmoral Park.  Movant's advised Debtors that paying the Balmoral Tax Obligation would save Balmoral and its estate the potential interest expense, legal expense, and penalties that might otherwise accrue during the Chapter 11 Cases. With the support of the Judgment Creditors and the Galt Trusts, Movant drafted, filed and brought to hearing that certain *Motion of Debtors for Authority to Pay Certain Prepetition Real Estate Taxes and Related Fees* [Docket no. 240].   Based on Movant's efforts to gain support of the Judgment Creditors and the Galt Trusts for payment of the Tax Obligations, no objections were raised to the motion.  The Court approved the motion and entered an order on July 21, 2015 [Docket No. 267] granting the relief requested therein.

### iii.   Settlement with Galt Trusts

After selling and assigning its rights and interest to the Commercial Lease, and after ceasing its racing operations, Maywood maintained its business operations at the Maywood Track for purposes of winding down and selling its remaining personal property in 2016.  The

Maywood Primary Lease, however, was deemed rejected effective as of December 31, 2015. Movant negotiated with the Galt Trusts to obtain continued limited use and occupancy of the Maywood Track Parcel, rent free for a specific period of time, for Movant to complete its wind down and sale efforts.

Outstanding disputes remained between the Debtors and Galt Trusts related to the Galt Trusts' prepetition rejection claim, an administrative priority claim asserted in that certain "Motion to Compel", as defined below, and extension of Debtors' use of the Maywood Track Parcel. Movant worked over many months with Judgment Creditors' Counsel and counsel for the Galt Trusts to find a resolution for such claims, as they represented significant disputed pre- and post-petition obligations of Maywood's estate. Equally critical were Movant's efforts to ensure that Maywood continued to have post-rejection the access to the Maywood Track Parcel in order to sell its vast amount of tangible personal property assets located thereon (collectively, the **"Maywood Personalty"**). Access was further required to maintain Maywood's business records and ensure organization and transfer thereof to the Creditor Trustee.

These disputes and claims primarily originated from the following: (1) that certain *Landlord's Motion to Compel Payment of Post-Petition, Pre-Rejection Rent and Taxes* [Docket No. 440] (the **"Motion to Compel"**) filed on March 9, 2016 by the Galt Trusts; (2) the proof of claim filed on behalf of the Galt Trusts against Maywood [Claim No. 43-1] in connection with the Debtors' rejection of the Maywood Primary Lease (the **"Proof of Claim"**); and (3) any potential objection(s) of the Galt Trusts to the Amended Plan, a draft form of which counsel to the Galt Trusts had provided to Movant. In light of the complexity and potential costs associated with resolution of these disputes among the parties (the Judgment Creditors also initially objected to the Motion to Compel), Movant prioritized a consensual resolution over protracted

litigation in order to reduce the administrative costs necessarily incurred in the form of attorneys' fees and other costs that would be paid by the Debtors' estates in addition to any valid claims held by the Galt Trusts.

In the Proof of Claim the Galt Trusts asserted a general unsecured claim for damages from the rejection of the Maywood Primary Lease in the amount of $2,891,572.57 [Claim No. 43-1] (the "**Rejection Claim**"). The Proof of Claim also asserted an administrative expense claim in an amount not less than $1,013,626.96 on account of post-petition, pre-rejection rent, taxes and related expenses under the lease of the Maywood Track Parcel. The administrative expense claim was subsequently (and properly) prosecuted by way of the Motion to Compel. After a series of discussions led by Movant among the Judgment Creditors and the Galt Trusts, the asserted administrative claim was reduced to approximately $768,626. In addition, the Galt Trusts asserted an unliquidated administrative priority claim with respect Maywood's post-petition use and occupancy of the Maywood Track Parcel after March 30, 2016.

After the filing of the Motion to Compel and for the following three month period, Movant worked with the Debtors and analyzed the factual and legal support and defenses related to the Rejection Claim, the administrative claim, and the draft objection to the Plan. Movant engaged in a series of discussions with Judgment Creditors' Counsel and counsel for the Galt Trusts, which ultimately resulted in the a significant reduction of the pre- and post-petition amounts claimed and a formal settlement proposal, summarized below:

a. All administrative claims of the Galt Trusts were fully resolved and settled in exchange for a payment to the Galt Trusts of $450,000;

b. All general unsecured claims of the Galt Trusts were allowed for the reduced maximum amount of $2,100,000, and subject to further reduction of the claim for distribution purposes;

84

c. The Maywood Primary Lease was terminated but, notwithstanding such termination, and in consideration of the payments, the Debtors and Creditor Trustee continued to have the right to access and occupy the Maywood Track Parcel through and including the date twenty-one (21) days after entry of an order confirming the Plan to wind down the Debtors' affairs and transfer all of the Debtors' corporate books, records and files (and any remaining machinery and equipment related to same) to the Trustee.

d. The Galt Trusts agreed not to object, nor cause any other party in interest to object, to confirmation of the Plan or the adequacy of the Disclosure Statement.

Movant drafted the necessary motion to approve this compromise with the Galt Trusts and the Judgment Creditors, and filed same on June 23, 2016 [Docket No. 562] (the "**Galt Settlement Motion**").  The Court granted the Galt Settlement Motion pursuant to an order entered on July 7, 2016 [Docket No. 569].  Movant was able to achieve a significant benefit to the Debtors estate through the Galt Settlement Motion, whereby: (a) the Galt Trusts' administrative expense claim against the Debtors was reduced by approximately $300,000, exclusive of the attendant costs of litigating such claim; (b) the Rejection Claim was reduced by almost $800,000 from the amount originally asserted, and remained subject to further reduction depending on the extent to which the claims of the Judgment Creditors were ultimately allowed; (c) the Debtors' and Creditor Trustee secured an absolute right to remain on the Maywood Track Parcel following confirmation of the Amended Plan for administrative purposes; and (d)  the Debtors avoided the risk of an adverse plan confirmation process.

### 4.   Coast To Coast Operating Agreement and Subleases

The Debtors' primary revenues came from pari-mutuel wagering on the races run at the Tracks, "intertrack" races broadcast at the Tracks and at OTBs. As of the Petition Date, Balmoral licensed three (3) OTBs and Maywood licensed six (6) OTBs, all of which were operated pursuant to a written agreement with Coast To Coast, which was an organizational location

licensee under the Horse Racing Act and subject to regulation by the IRB. Coast To Coast also handled food and concession services at both of the Debtors' tracks pursuant to separate agreements and a concessionaire license required by the IRB. Coast To Coast's only clients were the Debtors.

Pursuant to agreements that historically were entered on an annual basis, and as of the Petition Date, Coast To Coast operated all nine (9) of the OTB businesses owned by the Debtors. Historically and under the then most current operating agreement, Coast To Coast, for its services, earned only a guaranteed minimum operating fee of $1,000 (annually) for each OTB location. The Debtors were obligated, however, to reimburse Coast To Coast in the amount of the net loss from consolidated operations of the OTBs per calendar year, if any. If the consolidated operations generated a net profit, Coast To Coast retained 50% and the remaining 50% is split between the Debtors.

The Debtors subleased from Coast To Coast the premises where eight (8) of the OTBs were located and operated; Balmoral owned the real estate where the Crestwood, Illinois OTB was located. The Debtors and Coast To Coast entered into separate Sublease Agreements for each of the applicable OTB locations (collectively, the "**Subleases**"). Separate from the operations of the OTBs, the Debtors each had written agreements with Coast To Coast governing the food and beverage concessions provided at the Tracks.

Under the Subleases, the Debtors' rent payments to Coast To Coast were the separate commissions earned by Coast To Coast as an organizational location licensee under the applicable provisions of the Horse Racing Act and subject to IRB regulations. While the Debtors were obligated to reimburse Coast To Coast for that amount under the operating agreement, the OTBs actually generated significant revenue for the Debtors. Importantly, the OTBs contributed

positively to the Debtors' overall yearly income - by an approximate $2.3 million net in 2015 - due to "host fees" earned by Maywood and Balmoral and the reduction of the Purse paid to Horsemen (through "recapture," which can only be earned by a racetrack, not an OTB).

As discussed above in connection with the Settlement Acceleration Motion, the Judgment Creditors carefully monitored and investigated the Debtors' business dealings with Coast To Coast. Movant had numerous dialogues with the Judgment Creditors' Counsel, the Debtors' management, and other constituencies to ensure transparency in all post-petition business operations, which generally continued in the ordinary course. Important to the post-petition operations was the maintenance of the Subleases. If the initial 120-day deadline to assume or reject the Subleases expired without extension the Debtors would be required to surrender possession and cease operations of the OTBs. In other words, the rejection of the Subleases without new OTB operations in place would have cut off a lucrative source of income for the Debtors' businesses and seriously jeopardized the Debtors' efforts to reorganize. Further, the inclusion of the OTBs in an potential going concern sale remained critical in light of the net income generated by the OTBs through the operating agreement and the Subleases.

Accordingly, Movant drafted, filed and successfully argued three (3) separate motions [Docket Nos. 153, 255, and 325] to extend the assumption/rejection deadline under Section 365(d) of the Code with respect to the Subleases. Movant presented the respective motions on April 21, 2015, July 21, 2015 and October 20, 2015. As part of its efforts to reduce costs and work efficiently in the Chapter 11 Cases, Movants generally scheduled the foregoing motions to be heard together with the motions to extend the Assumption/Rejection Deadline for the Maywood Leases. The Court granted each of the three motions [see Docket Nos. 164, 265, and

333]. Movant thereby preserved the Debtors ability to assume and assign the Subleases as part of their effort to sell the Tracks and their operations as going concerns.

## D. RIVERBOAT CASINOS' ISSUES AND SETTLEMENT EFFORTS

**SERVICES RENDERED**:

| ATTORNEY | HOURS | RATE | VALUE |
|----------|-------|------|-------|
| AFB | 14.00 | $325.00 /hr | $4,550.00 |
| HLA | 1.40 | $525.00 /hr | $735.00 |
| ESB | 62.50 | $395.00 /hr | $24,687.50 |
| SBC | 0.90 | $395.00 /hr | $355.50 |
| NRD | 17.70 | $150.00 /hr | $2,655.00 |
| CHG | 386.50 | $525.00 /hr | $202,912.50 |
| HBM | 2.00 | $525.00 /hr | $1,050.00 |
| NQR | 349.90 | $435.00 /hr | $152,206.50 |
| **TOTAL** | **834.90** | | **$389,152.00** |

Movant expended approximately 834.90 hours (see Group Exhibits D(1) - D(13) attached hereto) during these Chapter 11 Cases in matters directly involving the Judgment Creditors. Not surprisingly, the services rendered by Movant in this category are more than any other category in this Motion, except for the Administrative Category, given the significance of the Judgment Creditors' claims and active participation throughout the Chapter 11 Cases.

As stated, the Chapter 11 Cases were filed in direct response to the Judgment entered in favor of the Judgment Creditors on December 11, 2014 against Balmoral, Maywood and John, jointly and severally, in excess of $75 million. Despite Movant's attempts immediately following the entry of the Judgment to obtain a standstill agreement to forestall and possible permanently avoid the filings of the Chapter 11 Cases entirely, those efforts were unsuccessful and the filing of the Chapter 11 Cases was necessitated in order to stay the Judgment and protect the value of the Debtors' Assets and business for the benefit of all of their creditors, employees, and other interested parties.

Movant's efforts during these Chapter 11 Cases in this category have been focused in six (6) areas:

i.  Assist and advise the Debtors in efforts to formulate a settlement of the Judgment Creditors' claims which would in turn, permit a successful conclusion to these Chapter 11 Cases, including continuing communications with the Judgment Creditors' Counsel, often on a daily basis, on all aspects of the Chapter 11 Cases, including all motions filed, to foster a spirit of cooperation between the parties, facilitate uncontested proceedings to the extent practicable and minimize administrative expenses in the Chapter 11 Cases;

ii.  The contested proceedings arising from the Debtors' motion to retain Special Counsel[13];

iii.  Responding to the multiple Rule 2004 discovery requests served on the Debtors by the Judgment Creditors;

iv.  Rendering such assistance as was necessary in connection with post-trial matters in the District Court Litigation as they arose in the Chapter 11 Cases;

v.  Formulation and Negotiation of the "Stipulations", as defined below, which allowed the marketing efforts to get underway without contested proceedings, and eliminated numerous areas of potential controversy throughout the Chapter 11 Cases;

vi.  The "Debtors' Marketing Efforts", as defined below[14];

vii. The "Olech 9019 Motion", as defined below; and

viii. The "Proposed Johnston Releases", as defined below.

-------------------------------------------------------------------

1.      **Settlement Efforts and Continuing Communications.**      Even prior to the commencement of the Chapter 11 Cases, Movant strived to help the Debtors reach an acceptable

---

[13] As referenced in Footnote 7 above, Movant obtained the retention of Foley & Lardner LLP as special counsel for the District Court Litigation. Although initially objected to by the Judgment Creditors, such objection was resolved, leaving only the portion of the retention motion concerning the law firm's representation of the Debtors in IRB matters contested.

[14] Although Movant's efforts in this regard could also be categorized in the Asset Sale Category, Movant kept its time entries in this Category D, Riverboat Casinos' Issues and Settlement Efforts, as such services were in direct relation to the efforts of Movant and the Debtors to avoid contested proceedings between the Debtors and the Judgment Creditors and to reach an independent resolution of the Judgment Creditors' claims.

resolution of the claims held against them by the Judgment Creditors. Prior to the filing of the

Chapter 11 Cases, Movant promoted and drafted a standstill agreement and forwarded same to

the Judgment Creditors' Counsel. When that did not work and the Chapter 11 Cases had to be

commenced, Movant consistently pushed forward an agenda aimed at amicably resolving the

Judgment Creditors' issues – Movant clearly recognized this was key to a successful conclusion

to the Chapter 11 Cases, which was in the best interests of all of the Debtors' creditors,

employees, vendors and other interested parties.

Part of Movant's services in this regard was the maintenance of continuing

communication with the Judgment Creditors' Counsel to keep them apprised of necessary

actions being taken in the Chapter 11 Cases to preserve the value of the Debtors' estates.

In order to better understand the positions of the parties concerning the District Court

Litigation with a view towards fostering more productive Chapter 11 Cases and settlement

efforts, Movant also undertook an expedited review of the applicable law giving rise to the

Judgment. To that end, Movant did some preliminary research to understand the dynamics

surrounding the elements of a civil action under Chapter 96 of Title 18 of the United States Code

concerning Racketeer Influenced and Corrupt Organizations. Although Movant's involvement

was appropriately limited in any post-trial or appellate matters, Movant needed to have a basic

understanding of the factors underlying the Judgment and possible post-trial and appellate efforts

in order to best represent the Debtors in these Chapter 11 Cases, including, without limitation, all

settlement negotiations with the Judgment Creditors and the formulation and confirmation of the

Amended Plan as more fully described below.

More directly, Movant's services in this category focused on assisting the Debtors'

management in formulating settlement proposals; understanding the ramifications of such

settlements on the Debtors and their creditors; understanding how the applicable provisions of the Code operated under different settlement possibilities; drafting the actual proposal and submitting it to the Judgment Creditors' Counsel; and following up such submissions with telephone calls, emails and in-person meetings designed to keep the settlement process moving forward. Movant began within the first 30 days of the Chapter 11 Cases to work with the Debtors' management and principals in earnest to identify possible settlement scenarios. While continuing to have periodic discussions with Judgment Creditors' Counsel and the Debtors' co-judgment debtor, John, and his Chapter 11 counsel, Movant was able to assist and draft an initial settlement proposal that was submitted to the Judgment Creditors on February 13, 2015. After certain deliberations, the Judgment Creditors responded, and again, Movant was required to participate in multiple telephone conferences and numerous written communications with the Debtors' management and others; review and analyze alternative settlement possibilities; prepare drafts of possible responses; review, discuss and revise these as the discussions continued; and finalize what would be sent to the Judgment Creditors. These efforts proved successful.

Given the nature of the District Court Litigation, the size of the Judgment, the emotions of the parties, and the challenges facing the Debtors and others in the horseracing industry, the settlement aspect of the Chapter 11 Cases consumed an extensive amount of Movant's services as evidenced by Exhibit D hereof.

**2.    Retention of Foley & Lardner LLP as "Special Counsel".**    In Movant's determination, the scope of Special Counsel's retention encompassing IRB matters, objected to by the Judgment Creditors, was critical. Special Counsel had significant experience in gaming law, and had been providing services to the Debtors, certain of their principals, and their affiliates for approximately 25 years as of the Petition Date, including attendance on behalf of